UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNICORN CROWDFUNDING, INC. | : | |
| Plaintiff, | : | |
| | : | Civil No.: 18-cv-10110 |
| v. | : | |
| | : | VERIFIED MOTION |
| NEW STREET ENTERPRISE, INC. | : | FOR PRELIMINARY |
| d/b/a SOCIAL FIX; OSSIAN | : | INJUNCTION AND |
| VENTURES, INC.; and TERESA | : | MEMORANDUM OF |
| TATEOSSIAN, | : | LAW IN SUPPORT |
| | : | |
| Defendants. | | |

# UNICORN CROWDFUNDING INC.'S VERIFIED MOTION AND MEMORANDUM OF LAW IN SUPPORT OF PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

I.    **INTRODUCTION & BACKGROUND**............................................1

     A. Unicorn + Social Fix Relationship……………………………..2

     B. Unicorn and Social Fix Dispute……………………………….3

     C. Infringement and Tortious Interference…………………………4

     D. Need for a Preliminary Injunction…………………………......6

II.   **ARGUMENT**……………………………………………………….7

A.  **UNICORN IS LIKELY TO PREVAIL ON EACH OF ITS CLAIMS**......8

     **1. Unicorn Will Prevail on Its Trademark Claims**…………………..8

        a.  **Unicorn is the Owner of the UNICORN Trademark and Design mark**……………………………………………………………8

        b.  **UNICORN is a Valid Trademark**……………………………9

        c.  **There is a Likelihood of Confusion Between the Marks**………………………………………………………10

     **2. Unicorn Will Prevail on Its Tortious Interference Claims**……11

     **3. Unicorn Will Prevail On Its Claim For Deceptive Practice**…..12

B.  **UNICORN WILL SUFFER IRREPARABLE INJURY IN THE ABSENCE OF AN INJUNCTION**…………………………………………………..13

C.  **THE BALANCE OF HARDSHIPS TIPS DECIDEDLY IN UNICORN'S FAVOR AND THE PUBLIC INTEREST WOULD BE SERVED BY THE ISSUANCE OF AN INJUNCTION**……………………………………………….14

D.  **ATTORNEYS FEES ARE APPROPRIATE**………………………..15

III.  **CONCLUSION**………………………………………………..16

Unicorn Crowdfunding, Inc. ("Unicorn") submits this Verified Motion for a Preliminary Injunction and Memorandum of Law in Support pursuant to Fed. R. Civ. P. 65 and against New Street Enterprise, Inc. d/b/a Social Fix ("Social Fix"), Ossian Ventures, Inc. ("Ossian"), and Teresa Tateossian ("Ms. Tateossian") (collectively the "Defendants") and in support states as follows:

**I. INTRODUCTION & BACKGROUND**

This is a shakedown. The Defendants must be enjoined before Unicorn suffers any more irreparable harm than it has already suffered this week as a result of the Defendants' decision to interfere with Unicorn's most important relationships by sending "cease and desist" letters claiming that somehow they own Unicorn's trademark. This interference caused Bloomberg to remove Unicorn's branding from an October 30, 2018 Crowdfunding event in New York, even though Unicorn was a $150,000 lead sponsor of the event. The Defendants' interference is further causing substantial reputational harm.

Unicorn, founded in September 2017, is a production and media company that is producing the "Unicorn TV Show" for Bloomberg Television (the "Show").[1] *See* Doc. 1 at ¶9. The Show is a blend of "Shark Tank" meets "American Idol" where each episode will introduce audience members to an exciting and innovative company (a "Unicorn") that is participating in a round of equity

---

[1] Bloomberg Television is an American-based international cable and satellite business news television channel, owned by the New York headquartered Bloomberg L.P., and is distributed globally, reaching over 310 million homes worldwide. *Id.* at ¶10.

crowdfunding. *Id.* at ¶12.[2] Audience members then have the opportunity to invest into the companies by participating in an equity crowdfunding raise.

**A. Unicorn + Social Fix Relationship**

Shortly after Unicorn was founded it engaged Social Fix, a New York and New Jersey based digital marketing agency, to collaborate on a detailed marketing plan. *Id.* at ¶¶2, 13. As part of the marketing plan Unicorn and Social Fix developed various marketing materials, including a redesign of Unicorn's logo. *Id.* at ¶14. Social Fix was paid $5,000 for the initial marketing collaboration and related work, including the work for the logo. *Id.*

With a new logo and a basic marketing plan in place, Unicorn pitched the Show concept to Bloomberg Television. *See* Exhibit A, Bodik Declaration at ¶ 7. Bloomberg liked the concept and – following months of negotiations and meetings – entered into an agreement with Unicorn in March 2018. *See* Doc. 1 at ¶15; *See also* Ex. A at ¶ 8. Under the Agreement, Unicorn agreed (among other things) to pay for programming (the Show) on the Bloomberg TV cable network. Unicorn first unveiled the Show at Bloomberg's Equality Summit on May 8, 2018. Unicorn was the lead sponsor at the Equality Summit. *Id.* at ¶ 9. The Unicorn trademark and logo was prominently displayed throughout the event. The name of the Show is "Unicorn". *Id.* Unicorn has been using the UNICORN trademarks in commerce in connection with the Show on a nationwide basis since this event in May of 2018. *Id.*

---

[2] *See* https://theunicorn.tv

**B. Unicorn and Social Fix Dispute**

In late September 2018 Unicorn's co-founders, Mike Gelinas and Brian Bodik, made an internal decision to terminate its relationships with various consultants and contractors working on the development of the Show, including Social Fix, which is run by Ms. Tateossian. *See Id.* at ¶ 10. Before Unicorn's co-founders could inform Ms. Tateossian of the termination, she and the Social Fix team somehow caught wind of this imminent decision. *Id.* at ¶ 11. Without any notice or warning, on October 9, 2018, counsel for the Defendants sent a letter preemptively terminating its relationship with Unicorn and demanding an outrageous $1,651,693.04 for "services rendered to date" even though these fees were never agreed upon by Unicorn. *See* Doc. 1 at ¶ 18, 19; *See also* Ex. A at ¶ 12. This was the first time ever that Social Fix provided Unicorn with any invoices or claimed to be owed this astronomical amount of money. *Id.*

Aside from a very high level memorandum of understanding – in which Unicorn agreed to and paid Social Fix $5,000 – the parties had no written service agreement of any kind in place. *See* Ex. A at ¶ 13. The October 9 letter also claimed for the first time the Defendants' purported "ownership" over the marketing materials prepared by Social Fix, including but not limited to, the Unicorn trademark and logo. The Defendants demanded that Unicorn cease and desist from using the Unicorn brand name and logo unless it was willing to pay Social Fix over $1.5 million dollars. *See* Doc. 1 at ¶18; *See also* Ex. A at ¶ 16.

On October 15, 2018 counsel for Unicorn responded to the Defendants'

3

demands and threats by explaining that it was Unicorn's understanding that Social Fix had been paid $5,000 for the initial marketing materials, including the design of the Unicorn trademark and logo, and that Unicorn had never agreed to pay the fees it allegedly claimed due and owing. *See* Doc. 1 at ¶ 20. After hearing nothing for ten days, on October 25, 2018, counsel for the Defendants finally responded by emailing another letter stating "I do not believe an amicable resolution is possible at this point, unless, [sic] your client pays its bills in full." *Id.* at ¶21. This same letter notified Unicorn that Social Fix had fraudulently applied to register "The Unicorn" trademark and logo with the United States Patent and Trademark Office. *Id.; see also* Fraudulent Application, Ex. B. Once again, the Defendants demanded that the "total bill" of $1,651,693.04 be paid by 5:00 pm the following day "or else…" the Defendants would notify Unicorn's business affiliates and take legal action without any further notice, among other threats. *See* Doc. 1 at ¶21.

The timing of this correspondence was not a coincidence: Social Fix knew that Unicorn was once again the lead sponsor of a Bloomberg event scheduled to take place on October 30, 2018 in New York City. *Id.* at ¶22; *see also* Ex. A at ¶17. The Defendants' threats were nothing less than extortion: an attempt to wrestle money away from Unicorn by threatening to disrupt and interfere with Unicorn's sponsorship of Bloomberg's October 30, 2018 event. *Id.*

**C. Infringement and Tortious Interference**

On October 28, 2018, on the eve of the Unicorn sponsored "Future of

4

Crowdfunding" event at Bloomberg's offices in New York, the Defendants "made good" on their threats by sending false "cease and desist" letters to Bloomberg and another Unicorn affiliate, Variety. *See* Doc. 1 at ¶25. The cease and desist letter contained a litany of misrepresentations, including that the Defendants are the "owners" of the Unicorn trademark, and that either Bloomberg or Variety's use of the trademark would be an unauthorized use giving rise to trademark infringement, dilution, unfair competition and other claims. *Id.* at ¶26. Despite Social Fix never having used the Unicorn trademark in commerce to identify itself as the owner or source of the Show (a fact they curiously concede), they are falsely claiming ownership and exclusive rights to use and enforce the trademark.[3] *See* Ex. A at ¶ 19.

As a result of the Defendants' transmittal of the cease and desist communications mere hours before Unicorn was set to be the lead sponsor for the "Future of Crowdfunding" event, Bloomberg's legal department directed its team to remove all Unicorn trademarks and branding from the event, a decision that caused substantial reputational and financial damage to Unicorn and its brand. *See* Doc. 1 at ¶28; *See* also Ex. A at ¶ 20.  Unicorn had invested hundreds of hours and substantial sums of money preparing for the event and was expecting that the Unicorn trademarks would be highly visible and clearly displayed for the entire crowdfunding community in attendance at the event.

---

[3] If that were not enough, the Defendants have filed a fraudulent Section 1(b) trademark application with the USPTO.  Clearly, without any bona fide intent to use this mark in commerce, this application is well on its way to constituting fraud on the PTO.

5

*See* Doc. 1 at ¶27; *See* also Ex. A at ¶ 22. In other words, the Defendants' communications directly and proximately caused Unicorn to effectively lose the value of its sponsorship arrangement with Bloomberg; the Defendants' conduct also caused reputational harm with Bloomberg and Variety, and caused Unicorn to miss out on presenting its brand to the crowdfunding community at the event. *See* Doc. 1 at ¶28; *See* also Ex. A at ¶ 23. The total extent of damage caused to Unicorn's relationship with Bloomberg and Variety is yet to be seen, but Unicorn's business relationship and reputation have undoubtedly been harmed irreparably. *Id.* at ¶¶28-30; *See* also Ex. A at ¶ 24.

**D. Need For a Preliminary Injunction**

Unicorn now brings this motion seeking a preliminary injunction to enjoin the Defendants from further engaging in any more illegal actions. The Defendants' continued use and patently false claim to "ownership" of the Unicorn trademarks and tortious interference with Unicorn's business relationships is causing irreparable harm. Such relief is warranted because the Defendants' acts are likely to cause confusion as to the source, affiliation, or approval of the Defendants' goods and services and to dilute the quality of the Unicorn trademarks in violation of federal and state law. *See* Doc. 1 at ¶¶33-40. Additionally, the Defendants' acts are, and are likely to continue, interfering with Unicorn's business relationships for the purpose of intentionally inflicting harm on Unicorn's business reputation and to extort money from Unicorn. *See* Doc. 1 at ¶¶42-45. Unicorn will continue to suffer irreparable harm in the

absence of an injunction.

Finally, an injunction against the Defendants serves the strong public interest in maintaining the integrity of the trademark system by enforcing trademark rights and by assuring trademark owners that rogue and disgruntled vendors with no use in commerce cannot falsely assert trademark rights to interfere with the true owner's business and business relationships.

## II. ARGUMENT

In order to obtain preliminary injunctive relief on its claims for trademark infringement and tortious interference, Unicorn must show: (1) a likelihood of success on the merits (or sufficiently serious questions going to the merits to make them fair ground for litigation); (2) that it is likely to suffer irreparable injury in the absence of the injunction (and remedies available under the law, such as monetary damages, are inadequate to compensate for that injury); (3) that the balance of hardships tips in the moving parties' favor; and (4) that the public interest would not be disserved by the issuance of a preliminary injunction. *U.S. Polo Ass'n, Inc. v. PRL USA Holdings Inc.*, 800 F. Supp. 2d 515, 540 (S.D.N.Y. 2011), *aff'd*, 511 Fed. Appx. 81, 85 (2d Cir. 2013); *cf. Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2011) (adopting permanent injunction standard set forth in *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006) for a preliminary injunction for alleged copyright infringement).

As shown below, Unicorn meets each of these criteria.

## A. **UNICORN IS LIKELY TO PREVAIL ON EACH OF ITS CLAIMS**

Unicorn is entitled to a preliminary injunction enjoining the Defendants from using the Unicorn trademark and logo, including, but not limited to, using the mark in the Defendants' communications with third parties, asserting exclusive rights to the mark with the USPTO, and tortiously interfering with Unicorn's business relationships.

1. **Unicorn Will Prevail On Its Trademark Claims**

To prevail on a claim under 15 U.S.C. §1125(a) (§43 of the Lanham Act), the plaintiff must show (1) that its mark is valid and protectable and (2) that the defendant's use of the mark is likely to confuse consumers. *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003). Under either provision, "[l]ikelihood of confusion includes confusion of any kind, including confusion as to source, sponsorship, affiliation, connection, or identification." *Star Inds., Inc. v. Bacardi & Co.*, 412 F.3d 373, 383 (2d Cir. 2005) (citation omitted); *see also Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204–05 (2d Cir. 1979) ("The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement.").

a. **Unicorn is the Owner of the UNICORN Trademark and Design mark**

Unicorn has been using the UNICORN trademarks in commerce since May of 2018. *See* Ex. A at ¶ 9. Accordingly, Unicorn owns the trademark because a fundamental principle of trademark law is that trademark rights arise solely

from the ***use of a mark in commerce*** to represent the goodwill of an ongoing business. *See Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 60 L. Ed. 713, 36 S. Ct. 357 (1916); *Berni v. International Gourmet Restaurants of America, Inc.*, 838 F.2d 642 (2d Cir. 1988); 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition §§ 16.01, 16.03, 19.01[1] (1992). This concept is reflected in caselaw and in the Lanham Act, which makes current use a prerequisite to the registration of a trademark and provides that cessation of use results in forfeiture of trademark rights. *See* 15 U.S.C. §§ 1051, 1064, 1127 (West Supp. 1993); *Stetson v. Howard D. Wolf & Associates*, 955 F.2d 847, 851 (2d Cir. 1992); *Silverman v. CBS, Inc.*, 870 F.2d 40 (2d Cir.), cert. denied, 492 U.S. 907, 106 L. Ed. 2d 569, 109 S. Ct. 3219 (1989).

Any trademark practitioner would agree that Unicorn owns the right to use the trademark, even though the Defendants fraudulently filed a Section 1(b) application.

### b.  UNICORN is a Valid Trademark

Under the law of the Second Circuit, the protection afforded a mark depends on whether the mark is generic, descriptive, suggestive, arbitrary or fanciful. *Bernard v. Commerce Drug Co.,* 964 F.2d 1338, 1340 (2d Cir. N.Y. 1992). A generic term can never be a valid trademark (and can never be registered). *Id.* citing *Papercutter, Inc. v. Fay's Drug Co.,* 900 F.2d 558, 561-62 (2d Cir. 1990). A descriptive term can be protected only if it has acquired secondary meaning. *Id.* Suggestive, arbitrary or fanciful marks may be

9

protected without a showing of secondary meaning. *Id.* A "suggestive" mark offers suggestions of, but does not actually describe, the features of a product. *W.W.W. Pharmaceutical Co. v. Gillette Co.*, 984 F.2d 567, 572 (2d Cir. 1993). An arbitrary mark has an actual dictionary meaning, but that meaning does not describe the product. A fanciful mark is a made-up term. *See Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1075-76. (2d Cir. 1993). T

Here, the UNICORN mark is entitled to protection because it is either suggestive or fanciful. *Id.*

c. <u>There is a Likelihood of Confusion Between the Marks.</u>

Unicorn can easily establish a likelihood of confusion under the eight-factor test established in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961), *cert.denied*, 368 U.S. 820 (1961). The factors are: (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may 'bridge the gap' by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market." *Star Indus*, 412 F.3d at 384. In balancing these factors, the "analysis is not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused." *Id.*

As set forth on their sworn trademark application, the Defendants intend on using the trademark in the ***exact same manner*** as Unicorn. *See* Ex. B. ("Entertainment services, namely, an ongoing series featuring challenges of raising capital by providing start-ups with access to a hard-to-reach influential global audience of professional investors provided through cable television"). As a result, under the *Polaroid* factors, there is no question that confusion will occur if the Defendants are not enjoined because each factor weighs in Unicorn's favor due to the identical nature of the services contemplated by the application.[4]

## 2. Unicorn Will Prevail on Its Tortious Interference Claims.

New York law is well settled that to prevail on a claim for tortious interference with prospective business relations, Unicorn should prove that (1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship. *Carvel Corp. v. Noonan*, 350 F.3d 6, 17, 2003 U.S. App. LEXIS 23744, *30-31 citing *Goldhirsh Group, Inc. v. Alpert*, 107 F.3d 105, 108-09 (2d Cir. 1997); *Purgess v. Sharrock*, 33

---

[4] By filing a Section 1(b) application, the Defendants swear, under oath, that they (1) believe that the applicant is entitled to use the mark in commerce; (2) have a bona fide intention to use the mark in commerce on or in connection with the goods/services in the application, and had a bona fide intention to use the mark in commerce on or in connection with the goods/services in the application as of the application filing date; and (3) believe to the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive.

F.3d 134, 141 (2d Cir. 1994).

Here, Unicorn had a substantial business relationship with Bloomberg. *See* Ex. A at ¶¶ 7-8. The Defendants knew of that relationship and intentionally interfered with it by sending false and misleading cease and desist letters to Bloomberg and Variety. *See* Ex. A at ¶¶ 18, 23. The Defendants decision to transmit such communications to Unicorn's business partners was done out of malice and was unfair and improper because it does not "own" the UNICORN Trademarks and it knew it was not using the mark at the time that of the interference. The interference caused substantial harm to Unicorn because Bloomberg removed all the branding that Unicorn purchased for the October 30, 2018 event in New York.

### 3. <u>Unicorn Will Prevail On Its Claim For Deceptive Practices</u>

The statutory elements of a claim for deceptive practices under this broadly worded statute are simply that (1) the act or practice be misleading in a material respect, and (2) that the plaintiff be injured. *See* R.A. Givens, Practice Commentaries to N.Y.Gen.Bus.Law § 349 at p. 565 (McKinney 1988). The Defendants' decision to send cease and desist letters claiming to own the exclusive rights in the Unicorn trademark and authority to police, enforce and file suit for infringement of the trademark is beyond misleading – it is simply false. Unicorn has undeniably been injured as set forth herein as a result of the Defendants' misleading acts. Unicorn has a reasonable likelihood of succeeding on its claims under New York law.

## B. UNICORN WILL SUFFER IRREPARABLE INJURY IN THE ABSENCE OF AN INJUNCTION.

Once a violation of the Lanham Act is demonstrated, injunctive relief will readily issue. *Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 503 (S.D.N.Y. 2013) ("[A] party's demonstration of a likelihood of success on an infringement claim often foretells a finding of irreparable harm."). A trademark holder's potential loss of goodwill and control of one's trademark constitutes irreparable injury. *U.S. Polo Ass'n, Inc.*, 800 F. Supp. 2d at 540 ("Irreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark . . . .") (quoting *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 343 (S.D.N.Y. 2010)); *see also NYC Triathlon*, 704 F. Supp. 2d at 343 ("Prospective loss of . . . goodwill alone is sufficient to support a finding of irreparable harm.").

Here, the Defendants' trademark filing and representations to Unicorn's affiliates Bloomberg and Variety that the Defendants – and not Unicorn – own the trademark have caused irreparable harm. If companies such as Social Fix are able to continue to claim ownership of marks where that ownership is false (and based upon nothing), then the Unicorn trademark will lose its commercial value. *See Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 44 (2d Cir. 1986). ("[O]nce a trademark owner loses control of its mark by failing zealously to watch over its use by others—or by

not objecting to its unauthorized use—the reputation associated with the mark is reduced."); *Murjani Int'l, Ltd. v. Sun Apparel, Inc.*,1987 WL 15110, at *13, (S.D.N.Y. July 31, 1987) ("The probability of serious dilution in the value of the marks by any unauthorized use on the part of defendants provides an adequate basis for a finding of irreparable injury.").

With regard to the interference and deceptive practices claims, the Defendants must be stopped. They have already caused serious and irreparable harm to Unicorn's reputation, and each day that goes by without an injunction provides them with additional opportunities to falsely claim to other Unicorn business partners and affiliates that they own a trademark that they have never used, nor have any intention to use the trademark in the manner fraudulently set forth in its application.

Accordingly, the Defendants must be enjoined from further interfering with and deceiving Unicorn's business affiliates.

## C. **THE BALANCE OF HARDSHIPS TIPS DECIDEDLY IN UNICORN'S FAVOR AND THE PUBLIC INTEREST WOULD BE SERVED BY THE ISSUANCE OF AN INJUNCTION.**

The public interest is to preserve and defend intellectual property, not to allow it to be, in effect, stolen. "The Second Circuit has long held that there is a 'strong interest in preventing public confusion," and since Unicorn has shown that Defendants' actions are likely to cause consumer confusion, "the public interest would not be disserved by the issuance of a preliminary injunction." *See Juicy Couture, Inc.*, 930 F. Supp. 2d at 505 (citation omitted). Indeed, that

Defendants' continue to falsely claim ownership rights in the Unicorn mark willfully demonstrates plainly that the public interest would be served by deterring such behavior. In fact, this situation is particularly egregious since the Defendants are not only misusing the UNICORN trademark, but also misusing it as a sword to disparage and slander Unicorn to third parties like Bloomberg and Variety.

D. **ATTORNEYS FEES ARE APPROPRIATE.**

The Supreme Court in 2014 construed the Lanham Act's term "exceptional case" in the identically-worded fee-shifting provision of the Patent Act, 35 U.S.C. § 285. *See Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756, 188 L. Ed. 2d 816 (2014). The Court held: "An 'exceptional' case, then, is simply one that stands out from others with respect to the substantive strength of the party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Id*. Relevant factors, the Court stated, include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id*. at 1756 n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19, 114 S. Ct. 1023, 127 L. Ed. 2d 455 (1994)).

Under this standard, a district court is to determine the exceptional nature of a case on a case-by-case basis, "considering the totality of the

circumstances." *Id*. at 1756.

There could be no more frivolous and egregious misuse of the United State's trademark system – or another's mark – as the one used as an extorting collection mechanism by the Defendants in this case. The Defendants were upset that they were terminated, and rather than move on as professionals often do, they sought revenge by fraudulently applying for their client's trademark, and sending proof of that filing to their client's best partners in an attempt to extort over a million dollars in unearned fees. This is the height of unreasonableness, and Unicorn should be awarded its attorneys' fees for having to bring this action.

### III. CONCLUSION

For the foregoing reasons, Unicorn's motion for a preliminary injunction should be granted, and Defendants should be enjoined immediately, for the pendency of this case, from using the Unicorn trademark or claiming ownership rights in and to the Unicorn trademark and from otherwise tortiously interfering with and deceiving Unicorn's business affiliates.

Dated: October 31, 2018     JAYARAM LAW, INC.

By: /s/ Wendy Heilbut

Wendy Heilbut
142 West 57th Street, 11th Floor
New York, NY 10019
Phone: 646.596.1322
Email: wendy@jayaramlaw.com

Vivek Jayaram (Admitted to New York Bar, *pro hac vice* forthcoming)
125 S. Clark Street, Suite 1175
Chicago, IL 60603
Phone: 312-212-8676
Cell: 646-325-9855
Email: vivek@jayaramlaw.com