UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

UNICORN CROWDFUNDING INC.,

                       Plaintiff,

-v-

NEW STREET ENTERPRISE, INC., d/b/a SOCIALFIX;
OSSIAN VENTURES, INC.; and TERESA TATEOSSIAN,

                       Defendants.

18 Civ. 10110 (PAE)

OPINION & ORDER

------------------------------------------------------------

PAUL A. ENGELMAYER, District Judge:

      Plaintiff Unicorn Crowdfunding, Inc. ("Unicorn") brings this action against defendants New Street Enterprise, Inc. d/b/a Socialfix ("Socialfix"), Ossian Ventures, Inc. ("Ossian"), and Teresa Tateossian ("Tateossian") (collectively, "defendants"), alleging violations of the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, as well as New York statutory and common law.  Defendants bring four counterclaims: (1) breach of contract; (2) quantum meruit; (3) unjust enrichment; and (4) promissory estoppel.

      Unicorn now moves to dismiss defendants' counterclaims, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim.  For the reasons that follow, the Court denies Unicorn's motion to dismiss.

1

I.  **Background**

   A.  **Factual Background**[1]

Unicorn, a Delaware corporation with its principal place of business in New York, is a production company planning to produce *The Unicorn*, a television show created for Bloomberg Television ("Bloomberg") featuring start-ups competing to raise capital from a television audience of potential investors. Unicorn Compl. ¶¶ 1, 9, 11.

In June 2017, before Unicorn's incorporation, Unicorn's representative and largest shareholder, Carl Heil, contacted Socialfix to retain its marketing and design services. AC ¶ 10. Socialfix is a New Jersey corporation in the business of assisting other companies with marketing strategy, brand and content development, video production, and social media marketing. *Id.* ¶ 7. After multiple conversations, Unicorn and Socialfix executed a September 2017 Memorandum of Understanding ("MOU") to establish a marketing plan for Unicorn, including the redesign of Unicorn's logo. *Id.* ¶¶ 11, 15. Defendants allege that, in the MOU, Unicorn allocated Socialfix a $75,000 per month budget for that purpose. *Id.* ¶ 11.

In November 2017, Unicorn's founder and CEO, Brian Brodik, Unicorn's primary investor, Mike Galinas, and Heil initiated discussions with Socialfix managing partner Ken Krysinski and proposed giving Socialfix a 4% equity stake, valued at $1 million, in what was to be Unicorn's holding company, Aries Group. *Id.* ¶¶ 14, 19.

Defendants allege that Socialfix had begun providing Unicorn with a series of services two months earlier, in September 2017, and that over the next several months Unicorn

---

[1] The following account is drawn from Unicorn's complaint, Dkt. 1 ("Unicorn Compl."), and defendants' Amended Counterclaim, Dkt. 32 ("AC"). For purposes of resolving a motion to dismiss, the Court accepts as true all factual allegations in the AC, drawing all reasonable inferences in defendants' favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

increasingly called upon Socialfix to supply additional products and services. These included video production, photoshoots, casting calls, and organizing business meetings to procure potential investors. *Id.* ¶¶ 13, 15, 17. Throughout this period, Socialfix made Unicorn aware that it was investing substantial time, energy, and resources into this venture with the expectation of remuneration in the form of the 4% equity stake in Aries Group. *Id.* ¶ 18.

In March and April 2018, defendants allege, Galinas confirmed via multiple emails Unicorn's intention to compensate Socialfix. Galinas, on one occasion, stated that Unicorn had "discussed providing Social[f]ix with a 4% Equity Stake in Aries Group Holdings and we intend to honor that percentage"; he also expressed his appreciation to Socialfix for having "played a critical role to getting us where we are today and looking forward to working closer with you moving forward." *Id.* ¶¶ 19, 21–22 (internal alterations omitted). In ongoing text message and verbal exchanges, Unicorn continued to reassure Socialfix, and Socialfix continued providing a variety of services. *Id.* ¶¶ 20, 23.

Defendants allege that in May 2018, Tateossian took over Krysinski's role as Socialfix's liaison to Unicorn, and the parties abandoned the holding company idea in favor of a proposal by Unicorn to provide defendants with 1.25 million shares in Unicorn, equal to a 10% equity interest. *Id.* ¶ 25. This 10% stake in Unicorn would be assigned to Ossian, a company created by Tateossian for the purpose of maintaining an ownership interest in Unicorn. *Id.* ¶ 26. Thereafter, counsel retained by Unicorn prepared a written Shareholder Purchase Agreement, memorializing the agreement as to the 1.25 million shares for Tateossian's review and signature. *Id.* ¶ 27. However, defendants allege, to date, Unicorn has not compensated defendants, as allegedly required by the agreement between the parties. *Id.* ¶ 30. According to defendants,

"[b]ut for the tireless efforts and work provided by Defendants, Unicorn would have no business and marketing plan, logos, business or product." *Id.* ¶ 31.

Unicorn, for its part, disputes that the parties ever entered into any such agreement and that it has any obligation to pay defendants, and asserts that it is the exclusive owner of the Unicorn trademarks. Unicorn Compl. ¶¶ 20, 34–35. Unicorn acknowledges that, in the ensuing months, it continued to display and use the "Unicorn Mark" created by Socialfix in order to advertise, cast, and promote its show nationwide. *Id.* ¶¶ 16–17.

On October 9, 2018, counsel for defendants sent Unicorn a letter terminating their relationship and demanding that Unicorn stop using its marketing materials and tender $1.6 million to defendants for "services rendered to date." *Id.* ¶ 19. On October 28, 2018, ahead of a Bloomberg event to be sponsored by Unicorn on October 30, 2018, defendants sent cease and desist letters to Unicorn's business affiliates Bloomberg and Variety. *Id.* ¶¶ 26, 28. Shortly thereafter, before the event, Bloomberg, heeding defendants' cease and desist letter, removed Unicorn's branding from the event space. This prompted Unicorn to file this action. *Id.* ¶ 29.

### B.    Defendants' Counterclaims

Defendants bring four counterclaims. First, they claim a breach of contract. They allege that Unicorn breached its promise to pay defendants 1.25 million shares of Unicorn stock for their work, which allegedly included "more than $1,000,000 in services, thousands of dollars in costs and unreimbursed expenses and hundreds of man hours." AC ¶¶ 33–34. Second, defendants bring a claim for quantum meruit. They allege that because Unicorn "readily accepted" defendants' services and because defendants had a "reasonable expectation of receiving compensation," defendants are entitled to the reasonable value of services rendered. *Id.* ¶¶ 38–40. Third, defendants bring a claim for unjust enrichment. They allege that it would

4

be "against equity and good conscience to permit Unicorn to retain the benefits" of its direct business relationship with defendants, at their considerable expense, without "compensating them for the fair value of their services and product." *Id.* ¶¶ 43–44. Fourth, defendants bring a claim for promissory estoppel. They allege that they relied on repeated promises of payment by Unicorn—"foregoing other work so that [they] could devote a substantial number of man hours" towards work for Unicorn—and claim that injustice can be avoided only by enforcing Unicorn's promise of payment. *Id.* ¶¶ 46–49.

### C. Procedural History

On October 31, 2018, Unicorn filed the Complaint and a motion for a preliminary injunction. Dkts. 1, 8. On November 8, 2018, the Court ordered that any opposition be filed by November 16, 2018. Dkt. 22. On November 15, 2018, the parties entered into a consent order, under which Unicorn withdrew its motion for a preliminary injunction and defendants agreed to be preliminarily enjoined from using the "Unicorn" trademarks. Dkt. 24. On December 6, 2018, defendants filed their answer and counterclaims. On December 18, 2018, the Court set an initial pretrial conference for March 6, 2019. On January 15, 2019, Unicorn moved, under Federal Rule of Civil Procedure 12(e), for a more definite statement. Dkt. 31. On January 16, 2019, defendants refiled their answer and counterclaims, Dkt. 32, and Unicorn withdrew its motion under Rule 12(e). On January 30, 2019, Unicorn moved to dismiss defendants' counterclaims, as amended. Dkt. 34. On February 13, 2019, defendants filed their opposition. Dkt. 35. On February 21, 2019, Unicorn filed its reply. Dkt. 36.

## II. Legal Standards on a Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint, including, as here, one consisting of counterclaims, must plead "enough facts to state a claim to relief that is plausible

on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

In considering a motion to dismiss, a district court must accept as true all well-pled factual allegations in the complaint, and draw all reasonable inferences in the plaintiff's favor. *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014). However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[R]ather, the complaint's *factual* allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570) (internal quotation marks omitted) (emphasis in *Arista Records*). A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III. Discussion

Unicorn argues that defendants do not plead adequately their breach of contract and quasi-contract counterclaims. The Court considers each theory of recovery in turn.

### A. Breach of Contract Counterclaim

Unicorn first challenges defendants' breach of contract counterclaim. To establish a breach of contract under New York law, a party must plead "(1) the existence of a contract,

6

(2) performance by the party seeking recovery, (3) non-performance by the other party, and (4) damages attributable to the breach." *RCN Telecom Servs., Inc. v. 202 Centre Street Realty LLC*, 156 Fed. Appx. 349, 350–51 (2d Cir. 2005). Here, Unicorn disputes the existence of a valid and enforceable contract between the parties. It argues that the AC does not plead facts from which a factfinder could reasonably infer that: (1) there was a meeting of the minds between the parties; (2) defendants performed their obligations under the alleged agreement; and (3) Unicorn did not perform its obligations under the alleged agreement. Defendants counter that, viewed in its totality, their AC pleads the elements of such a claim.

### 1. Mutual Assent

Unicorn argues that defendants have not alleged the mutual assent that is required for a binding contract. It argues that defendants fail to plead the existence of a specific agreement, oral or written, to support their breach of contract claim. However, as defendants note in their opposition to Unicorn's motion, under New York law, the "manifestation or expression of assent necessary to form a contract may be by word, act, or *conduct* which evinces the intention of the parties to contract." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 507 (2d Cir. 2009) (citing *Maffea v. Ippolito*, 247 A.D.2d 366, 367 (N.Y. 2d Dep't 1998)). Thus, "[a] party's conduct indicates assent when he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." *Id.* (citation omitted). Here, defendants maintain that their pleadings plausibly allege, including based on the parties' conduct, the existence of at least an implied agreement with Unicorn under which Unicorn would compensate defendants for their ongoing provision of marketing services to Unicorn.

The Court holds with defendants on this point. Contrary to Unicorn's contention, it is of no moment that the AC does not identify a one-stop written or oral agreement between the

7

parties. Here, defendants have plausibly alleged that an ongoing series of text messages, emails, and verbal assurances from Unicorn, viewed together, reflect a manifestation of assent between the parties. These communications include an email from Unicorn's primary investor, dated April 8, 2018, stating that Unicorn had "discussed providing Social[f]ix with a 4% Equity Stake in Aries Group Holdings and we intend to honor that percentage." AC ¶ 22. Defendants also allege a series of further emails, conversations, and text messages from Unicorn that confirm Unicorn's intention to pay defendants. *Id.* ¶ 20. Even assuming *arguendo* the absence of an express written or oral contract, the parties' course of dealings, as alleged, plausibly establishes mutual assent to a valid agreement.

### 2. Defendants' Obligations Under the Contract

Unicorn next argues that, even assuming an agreement of some sort, the AC does not identify the "specific terms of performance that were required of and performed by" defendants. Dkt. 34. Again, however, the defendants' pleading plausibly alleges an overall course of dealings sufficient to evince the terms on which the parties agreed. Indeed, the AC catalogues, in detail, the various business and marketing services provided by defendants at Unicorn's request, including "the creation of several infomercials to be launched on different television stations," AC ¶ 10; assistance with "video production, photoshoots, business meetings and development," *id.* ¶ 13; and the provision of services related to "business development, planning, logos and corporate formation assistance," *id.* ¶ 15.

To the extent that Unicorn argues that the AC does not identify which of the defendants are parties to the alleged contract, its argument fails. The AC sets out a detailed narrative of the working relationships among the relevant parties over a period of time, so as to fairly plead that each of the counterclaiming defendants is a party to the alleged agreement with Unicorn. These

are: Socialfix, which worked with Unicorn since September 2017; Tateossian, who beginning in May 2018 served as Socialfix's partner tasked with working alongside Unicorn; and Ossian, the company established by Tateossian to maintain the 10% ownership share of Unicorn that Unicorn proposed providing defendants in exchange for its continued services, memorialized in the Shareholder Purchase Agreement prepared and finalized by Unicorn. The AC adequately pleads that, pursuant to an understanding with Unicorn, each defendant was required to perform certain specified obligations.

### 3. Unicorn's Nonperformance Under the Agreement

Finally, Unicorn argues that, even if an agreement is plausibly alleged, defendants have failed to plead facts supporting the inference that Unicorn did not perform its obligations under it. That too is wrong. The AC sets out a series of communications with Unicorn from which a factfinder could reasonably infer, at a minimum, a promise by Unicorn to compensate defendants with 1.25 million shares of its stock, amounting to a 10% equity interest in the company. Between March and October 2018, defendants received multiple emails, text messages, and verbal assurances that they would receive payment for the fair value of their services. *Id.* ¶¶ 19–23, 29. As alleged, however, Unicorn to date has not furnished defendants that equity stake. *Id.* ¶ 30.

Defendants' AC therefore plausibly pleads a breach of contract claim. The Court denies Unicorn's motion to dismiss this claim. Discovery will elucidate whether the facts substantiate the AC's allegations.

### B. Quasi-Contract Counterclaims

Unicorn also moves to dismiss Counts Two, Three, and Four of the AC, which bring counterclaims sounding in quasi-contract: quantum meruit, unjust enrichment, and promissory

9

estoppel. *See, e.g.*, *Goldman v. Metro. Life Ins. Co.*, 5 N.Y.3d 561, 572 (2005). Under New York law, unjust enrichment and quantum meruit are not separate causes of action; the Court analyzes them together, *see Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005), and for purposes of this motion to dismiss, also considers the AC's promissory estoppel claim in tandem with these others.

As a threshold matter, that defendants have pled a viable breach of contract claim does not preclude their pursuit, at this stage, of parallel quasi-contract claims. It is true, as Unicorn notes, that under New York law, the presence of a valid and enforceable agreement between parties ordinarily precludes a party from, ultimately, recovering on both breach of contract and quasi-contract claims. *See Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388–89 (1987). But at the pleading stage, this rule governing recovery "does not require dismissal of quasi-contract claims that are pled in the alternative to contract-based claims, *i.e.*, that expressly are triggered only if no valid and enforceable contract resolves the dispute." *Johnson v. Carlo Lizza & Sons Paving, Inc.*, 160 F. Supp. 3d 605, 617 (S.D.N.Y. 2016) (citing *Mitchell v. Faulkner*, 531 F. App'x. 136, 137 (2d Cir. 2013) (summary order) ("Such an alternative pleading is permissible under New York law.")). "[W]here, as here, a bona fide dispute exists as to the existence of the contract, the plaintiff may proceed on both breach of contract and quasi-contract theories." *Nakamura v. Fujii*, 253 A.D.2d 387, 390 (N.Y. 1st Dep't 1998); *see also Hochman v. LaRea*, 14 A.D.3d 653, 655 (N.Y. 2d Dep't 2003). Indeed, "[a] contrary holding would breach Fed. R. Civ. Pro. 8(d), which provides: 'A party may set out 2 or more statements of a claim or defense alternatively or hypothetically . . . A party may state as many separate claims or defenses as it has, regardless of consistency.'" *Id.* Discovery and, if needed, trial will elucidate which, if any, of these claims has merit.

And the AC pleads sufficient facts to support recovery in quasi-contract. It alleges that defendants provided a variety of services and work product to Unicorn over a 13-month period with a reasonable expectation of remuneration that never materialized. The AC further alleges that Unicorn benefitted materially from defendants' marketing services, and that, as a result of multiple text messages, emails, and verbal assurances from Unicorn, defendants invested significant resources in Unicorn, relying on the promise and prospect of compensation, in the form of an assignment of 1.25 million shares in Unicorn's company. These allegations give a factfinder a basis to find Unicorn liable under one or more of the quasi-contract theories alleged. The AC therefore states a plausible claim for such relief.

## CONCLUSION

For the foregoing reasons, the Court denies Unicorn's motion to dismiss defendants' counterclaims. The Court respectfully directs the Clerk of Court to deny the motion pending at docket entry 34.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: June 12, 2019
       New York, New York