UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNICORN CROWDFUNDING, INC.,

                    Plaintiff and Counterclaim
                    Defendant,

       -v-

NEW STREET ENTERPRISE, INC., *d/b/a*
SOCIALFIX, OSSIAN VENTURES, INC.,
and TERESA TATEOSSIAN,

                    Defendants and Counterclaim
                    Plaintiffs.

---

NEW STREET ENTERPRISE, INC., *d/b/a*
SOCIALFIX, OSSIAN VENTURES, INC.,
and TERESA TATEOSSIAN,

                    Third-Party Plaintiffs,

       -v-

MICHAEL GELINAS and BRIAN BODIK,

                    Third-Party Defendants.

---

18 Civ. 10110 (PAE)

<u>OPINION &
ORDER</u>

PAUL A. ENGELMAYER, District Judge:

      This case arises from a falling out between the producer of a television program, plaintiff

and counterclaim defendant Unicorn Crowdfunding, Inc. ("Unicorn"), and its business partner,

defendant and counterclaim plaintiff New Street Enterprise, Inc., d/b/a Socialfix ("Socialfix").

For a little over a year, Socialfix worked with Unicorn to develop, brand, market, and advertise

the show, titled *The Unicorn*.  But at the end of that year, the relationship soured.  After Unicorn

rebuffed Socialfix's demands for payment for services it claimed to have provided to Unicorn,

Socialfix sent a cease-and-desist letter to the network on which the parties planned to air *The*

*Unicorn*—non-party Bloomberg Television ("Bloomberg")—claiming rights to the show's logo and other intellectual property associated with it.  As a result, Unicorn alleges, the network removed Unicorn's branding from a major promotional event and ultimately decided not to air the show.

Soon after Socialfix sent that letter, Unicorn commenced this action, suing Socialfix, its co-founder Teresa Tateossian, and Ossian Ventures, Inc. ("Ossian" and, together with Socialfix and Tateossian, "Socialfix") for false designation of origin, false description, and false representation under the Lanham Act, 15 U.S.C. § 1125(a); deceptive acts and practices under state law; and tortious interference with prospective business relations under state law.  Socialfix has since responded with counterclaims against Unicorn and two of its co-founders—third-party defendants Michael Gelinas and Brian Bodik—alleging breach of contract, unjust enrichment, quantum meruit, and promissory estoppel.  The counterclaims all arise from Unicorn's alleged failure to pay Socialfix for the work it performed.

Before the Court now are the parties' cross-motions for summary judgment.  Socialfix has moved for partial summary judgment, solely as to liability, on its counterclaims for unjust enrichment and quantum meruit.  It has also moved for summary judgment dismissing Unicorn's state-law claims.  Unicorn opposes Socialfix's motion as it relates to Socialfix's counterclaims for unjust enrichment and quantum meruit, but does not itself move for summary judgment on those claims.  Unicorn cross-moves for partial summary judgment, solely as to liability, on its claim for tortious interference and for full summary judgment on its Lanham Act claim.

For the reasons that follow, the Court grants Socialfix's motion in part and denies it in part, and denies Unicorn's motion.

2

# I.      Background

## A.      Factual Background[1]

### 1.      Parties

Plaintiff and counterclaim defendant Unicorn is a Delaware production and media company, with its principal places of business in New York and Illinois.  JSF ¶ 1; Unicorn 56.1 ¶ 1; Dkt. 1 ("Compl.") ¶ 1.  It intends to produce a television program, titled *The Unicorn*, through which viewers are introduced to contestant startup companies in which they can buy equity.  Unicorn 56.1 ¶ 1.  Third-party defendants Michael Gelinas and Brian Bodik, both residents of Illinois, are co-founders and shareholders of Unicorn, which they jointly operate.  JSF ¶¶ 2–3; Socialfix 56.1 ¶ 9.

---

[1] The Court draws its account of the facts from the parties' respective submissions on the motions for summary judgment, including: the parties' joint statement of undisputed facts, Dkt. 71 ("JSF"); Socialfix's Local Rule 56.1 statement, Dkt. 77 ("Socialfix 56.1"); Unicorn's Local Rule 56.1 counter-statement, Dkt. 82 ("Unicorn Reply 56.1"); Unicorn's separate Local Rule 56.1 statement, Dkt. 83 ("Unicorn 56.1"); Socialfix's Local Rule 56.1 counter-statement, Dkt. 90 ("Socialfix Reply 56.1"); the declaration of Joshua L. Weiner, Esq., in support of Socialfix's motion, Dkt. 79 ("Weiner Decl."), and attached exhibits; the declaration of Vivek Jayaram, Esq., in support of Unicorn's motion and in opposition to Socialfix's motion, Dkt. 85 ("Jayaram Decl."), and attached exhibits; the Weiner declaration in further support of Socialfix's motion and in opposition to Unicorn's motion, Dkt. 89 ("Weiner Reply Decl."), and attached exhibits; and the Jayaram declaration in further support of Unicorn's motion, Dkt. 92 ("Jayaram Reply Decl."), and the attached exhibit.

Citations to a party's 56.1 statement incorporate the evidentiary materials cited therein.  When facts stated in a party's 56.1 statement are supported by testimonial, video, or documentary evidence and not denied by the other party, or denied by a party without citation to conflicting admissible evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in statement required to be served by the opposing party."); *id.* Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Defendant and counterclaim plaintiff Socialfix, a New Jersey corporation with its principal place of business in New Jersey, is a digital-media marketing and consulting company. JSF ¶ 4.  It provides brand strategy, advertising, and website and mobile app design for businesses. *Id.*  Defendant and counterclaim plaintiff Teresa Tateossian, a New Jersey resident, owns and co-founded Socialfix along with non-party Ken Krysinski.  *Id.* ¶ 5; Socialfix 56.1 ¶¶ 1–2.

Defendant and counterclaim plaintiff Ossian Ventures is a Wyoming corporation with no principal place of business.  JSF ¶ 6.[2]

### 2.   *The Unicorn*

This case centers on the parties' efforts to produce and market a television program: *The Unicorn*.  The show's premise combines "aspects of TV shows *Shark Tank* and *American Idol*, with each episode introducing audience members to start-up companies participating in a round of equity crowdfunding."  Socialfix 56.1 ¶ 6; Unicorn 56.1 ¶ 2.  The show, in other words, envisions start-up companies appearing, pitching their idea to the audience, and gaining investments from viewers who see the start-up as promising.

### 3.   **Unicorn and Socialfix's Business Relationship**

In mid-2017, as Unicorn's founders developed their plans for the show, they began to look for a company to provide them with marketing, branding, and social-media services. Socialfix 56.1 ¶ 12.  In July 2017, Unicorn co-founder Carl Heil contacted Socialfix to ask about a potential partnership aimed at marketing and promoting the show.  JSF ¶ 7; Socialfix 56.1 ¶ 10. At the time, Unicorn intended Socialfix to serve as its "branding, marketing[, and] social media" experts.  Socialfix 56.1 ¶ 16; Unicorn 56.1 ¶ 3.  The services Socialfix provided would aim in part at recruiting companies to pay to participate in the show as contestants.  *See* Weiner Decl.,

---

[2] In its brief in support of summary judgment, Socialfix states that it "hereby dismiss[es] Ossian and Tateossian as parties" to their Amended Counterclaim.  *See* Dkt. 76 ("Socialfix Mem.").

Ex. E ("MOU") at 1.  Soon after, Heil introduced Tateossian from Socialfix to Bodik and

Gelinas at Unicorn.  Socialfix 56.1 ¶ 11; Weiner Decl., Ex. A ("Tateossian Tr.") at 60.

In September 2017, Socialfix and Unicorn entered into a Memorandum of Understanding

("MOU") prepared by Gelinas, Bodik, and Heil.  JSF ¶ 8; Socialfix 56.1 ¶ 14; Unicorn 56.1 ¶ 6;

*see* MOU at 2.  Neither side now contends that the MOU represented a binding contract.[3]

Instead, the MOU "provided a general outline of the initial deliverables that were to be provided

by Socialfix, as well as an estimated budget for the services Socialfix was to provide."  Socialfix

56.1 ¶ 13; Unicorn 56.1 ¶ 7.  The MOU contemplated a "good-faith deposit of $5,000 to get

started on preliminary and mutually beneficial work" to "kick-start the strategic partnership"

between the companies, and an "[e]stimated budget" of "$75,000 monthly on-going that will be

coming from companies being on-boarded."  MOU at 1.  It identified the following as the

"Deliverable":  "One marketing package that we can present to the companies that are being on-

boarded to the Unicorn Platform process.  In the package, it will include social media, marketing,

media buy, celebrity involvement, production, process flow and project management."  *Id.*

In one respect, the parties dispute the significance of the MOU.  Socialfix claims that the

MOU aimed to "outline the business relationship between Socialfix and Unicorn moving

forward," and that, consistent with the MOU, Socialfix expected to receive $75,000 per month

for its services.  Socialfix 56.1 ¶ 15; Socialfix Reply 56.1 ¶ 9; *see* Tateossian Tr. at 95; Weiner

Decl., Ex. B ("Krysinski Tr.") at 21.  Unicorn disagrees.  It maintains that the MOU was

intended only as an outline of the parties' arrangement "at the beginning of the relationship."

Unicorn Reply 56.1 ¶ 15.  As discussed more fully below, Unicorn argues that, apart from early

one-off payments such as the $5,000 "good-faith deposit" described in the MOU, the parties

---

[3] Socialfix usually entered into more formal engagement letters with its other clients, but it never
did so with Unicorn because their relationship was "different."  Unicorn 56.1 ¶ 11.

understood that, going forward, Unicorn would pay Socialfix with equity, not the $75,000-per-month cash "budget" set forth in the MOU.  *See id.*; *see also id.* ¶¶ 29–30.

### 4.    Unicorn's Relationship with Bloomberg

Bloomberg Television is a cable television network that Unicorn viewed as a good fit for *The Unicorn*.  Unicorn 56.1 ¶ 16.  In February 2018—while Unicorn and Socialfix were working together to develop, market, and brand the show—Unicorn pitched the show to Bloomberg.  Unicorn 56.1 ¶ 17.  Bloomberg liked "the concept."  *Id.*  In March 2018, after negotiations, Unicorn and Bloomberg entered into a sponsorship agreement.  *Id.*[4]  Unicorn claims that, under that agreement, it paid Bloomberg $625,000 to serve as a "lead sponsor" of five Bloomberg events.  *Id.* ¶ 18.  *But see* Socialfix Reply 56.1 ¶ 18.  It also claims that it spent another $75,000 on advertising and running commercials on Bloomberg.  Unicorn 56.1 ¶ 19.  *But see* Socialfix 56.1 ¶ 19.[5]  Unicorn viewed its relationship with Blomberg as essential to the show's development.  Unicorn 56.1 ¶ 20.  And much of the work that Socialfix and Unicorn did during their relationship sought to promote Unicorn and the show at the Bloomberg events.  *Id.* ¶ 21; *see* Socialfix Reply 56.1 ¶ 21 (admitting that the parties worked toward this end, but stating that Unicorn's evidence does not specify how much of such work was undertaken for that purpose).

---

[4] As discussed more fully below, Socialfix objects to Unicorn's reliance upon the terms of this agreement because, despite Socialfix's discovery requests, Unicorn has never produced the agreement itself.  *See, e.g.*, Socialfix Reply 56.1 ¶ 17.  Solely to provide context for the parties' claims, the Court relies on the declarations and testimony of witnesses to describe what Unicorn contends were the terms of that agreement.  As explained below, the Court agrees with Socialfix that Unicorn may not rely on the supposed contents of a written agreement that no party has produced.

[5] Socialfix also objects to Unicorn's evidence as to this purported expenditure because Unicorn's witnesses did not mention this sum until discovery had closed, when a Unicorn witness did so in a declaration submitted in support of Unicorn's summary judgment positions.  Socialfix Reply 56.1 ¶ 19.  The Court addresses these objections more fully below.  Its account here is intended solely to present Unicorn's contentions in full.

### 5.      Socialfix's Work Between October 2017 and October 2018

Between October 2017 and October 2018, the parties "developed and maintained a 'business relationship'" through which Socialfix provided a variety of services to Unicorn. Socialfix 56.1 ¶ 17; JSF ¶ 9.  Each agrees, in general, as to the services Socialfix performed. Those included:

- Participation in the creation of television show "concepts and treatments";[6]

- Introduction of Unicorn to individuals at EisnerAmper, an accounting firm;

- Introduction of Unicorn to potential investors;

- Creation of relationships with equity crowdfunding portals;

- Generation of sales commitments for the show;

- Design and creation of investor pitch pages, Unicorn business cards, PowerPoint presentations for display at Unicorn events, and giveaway packaging;

- "A host" of graphic-design related services;

- Staffing of employees at Unicorn events;[7]

- Organization of casts and callbacks to retain potential hosts for the show;

- Site walkthroughs and selections for filming; and

- Creation of ideas for other shows Unicorn might produce.

*See* Socialfix 56.1 ¶ 26; Unicorn Reply 56.1 ¶ 26.

---

[6] Unicorn disputes this fact, but only on the basis that Socialfix did not perform this service alone; Unicorn and others also helped.  *See* Unicorn Reply 56.1 ¶ 26(a); Jayaram Decl., Ex. C ("Gelinas Tr.") at 93.  Because Socialfix states only that it "participat[ed] in" this service, there is no genuine dispute of fact.  *See* Socialfix 56.1 ¶ 26(a).

[7] Unicorn notes that it did not request such services from Socialfix.  Unicorn Reply 56.1 ¶ 26(k). But Gelinas testified that Unicorn accepted those services and did not turn them away.  Gelinas Tr. at 108.

The parties disagree, however, on one aspect of Socialfix's services.[8]  Socialfix claims that its services included "[d]esigning and creating Unicorn's branding and logo."  Socialfix 56.1 ¶ 26(o).  Unicorn admits that Socialfix participated in that design process, but asserts that Unicorn also participated.  Unicorn Reply 56.1 ¶ 26(o).  The evidence the parties cite on this point supports Socialfix's position.  Gelinas testified that it was solely Socialfix that created Unicorn's logo.  *See* Gelinas Tr. at 128 ("Q. [Who] created that brand name logo, Socialfix?  A. We paid SocialFix to create the marketing and logo, and we paid them, with invoice.  Q. All I'm asking is who created it?  A. SocialFix.").  And Bodik, although first claiming at his deposition that "a combination of us and SocialFix" created the logo, when pressed, admitted that "SocialFix was doing the design" and that Unicorn merely provided "examples of how we wanted it to look."  Jayaram Decl., Ex. D ("Bodik Tr.") at 84–85.

Over the course of the parties' relationship, Unicorn repeatedly recognized the import and quality of Socialfix's work.  Gelinas testified that Socialfix was a "significant contributor to Unicorn's effort" related to *The Unicorn*.  Gelinas Tr. at 89–90.  In April 2018, Bodik told Krysinski that Socialfix had "played a critical role to getting us where we are today."  Bodik Tr. at 81–82.  Gelinas confirmed that, and added that, as of September 2018, he viewed Unicorn as "critical to getting Unicorn to where it was at that point."  Gelinas Tr. at 110.  Similarly, in September 2018, Bodik texted Tateossian that Socialfix had "legitimized us and brought in real sales and a brand."  Socialfix 56.1 ¶ 40.  At his deposition, he explained that he sent that text to

---

[8] As discussed more fully below, the parties also vigorously dispute the relevance and reliability of a number of invoices that Socialfix sent Unicorn in October 2018, as their relationship unraveled.  *See, e.g.*, Socialfix 56.1 ¶ 27; Unicorn Reply 56.1 ¶ 27.  Those invoices—which Tateossian admits to creating retroactively in fall 2018 and to being essentially "estimates" or "ballpark" figures—purport to capture, hourly, all services that Socialfix had provided to Unicorn but for which it had not been paid.  Socialfix 56.1 ¶ 27; Tateossian Tr. at 164, 178.

let Tateossian know that she "did a wonderful job" and that Socialfix "absolutely helped with the branding of [*The Unicorn*], with the logo and getting it out there."  Bodik Tr. at 180–81; *see also id.* at 180 ("[T]here is no doubt that we enjoyed the work that was done with the logo . . . .").  More prosaically, Bodik testified that Socialfix had upheld its end of the bargain, met its deadlines, and "provided value to Unicorn."  Socialfix 56.1 ¶¶ 20–22.  All in all, both Gelinas and Bodik testified that they were satisfied with the services Socialfix had provided to Unicorn during their year working together.  *See id.* ¶ 23; Bodik Tr. at 82–83; Gelinas Tr. at 65–66.  Neither party has cited evidence that, at any point between September 2017 and September 2018, Unicorn expressed or believed that Socialfix was providing less than the services the two companies had agreed upon.

### 6.      Unicorn's and Socialfix's Expectations of Compensation

Unicorn and Socialfix "mutually understood" that Unicorn would compensate Socialfix for its services.  Socialfix 56.1 ¶ 29; Unicorn Reply 56.1 ¶ 29.  And, they agree, in broad strokes, as to the form that payment was to have taken.  "Throughout the partnership between Socialfix and Unicorn, the parties understood that Socialfix would eventually be paid in equity."  Unicorn 56.1 ¶ 42.  Unicorn also states that "[w]hile the parties anticipated that Socialfix would primarily receive payment through a grant of equity in Unicorn, at the early stage of the relationship, Unicorn agreed to compensate Socialfix in cash for performing the limited services spelled out in the MOU."  *Id.* ¶ 8.  Socialfix agrees with that characterization.  Socialfix Reply 56.1 ¶ 8 ("Response: Admit.").  It also notes that its relationship with Unicorn was unlike its relationship with other clients, and was more "like a partnership."  Tateossian Tr. at 128.  Tateossian testified that she expected to receive 1.25 million shares of Unicorn stock for her participation in that partnership.  *Id.*

The parties dispute, however, Socialfix's claims to have expected cash payments of roughly $75,000 per month, per the estimated budget in the MOU.  *See* Socialfix Reply 56.1 ¶ 9. Unicorn contends that the only cash payments that either party contemplated were limited payments for discrete services set out in the MOU, including videos for some of the on-boarded companies, social-media services, print advertising, and a "Real Estate Sizzle Reel."  MOU at 1. Any other compensation, Unicorn maintains, was to take the form of equity.  *See* Unicorn Reply 56.1 ¶ 37.  And, according to Unicorn, contemporaneous invoices from between late 2017 and early 2018 confirm that it made those few cash payments.  *See id.*; Weiner Decl., Ex. H ("Cash Invoices") at 2 (October 26, 2017 payment of $5,500 for photography, video production, and makeup); *id.* at 3 (December 5, 2017 payment of $5,000 for video production and makeup); *id.* at 4 (March 30, 2018 payment of $5,000 for marketing); *see also id.* at 5 (reimbursement to Socialfix for $1,502.48).  According to Gelinas, one of the initial $5,000 payments from Unicorn to Socialfix compensated it for "all of the branding logo creation."  Gelinas Tr. at 49.

Those payments, totaling roughly $17,000, were all that Socialfix ever received from Unicorn.  *See* Socialfix Reply 56.1 ¶ 10; Unicorn Reply 56.1 ¶ 37.  Unicorn never provided Socialfix with any equity interest in Unicorn.  *See* Socialfix 56.1 ¶ 31; Unicorn Reply 56.1 ¶ 31.

### 7.    Breakdown of Unicorn and Socialfix's Relationship

For reasons that the summary judgment record leaves largely unexplained, in late September 2018 Unicorn internally decided to end its relationships with various contractors, including Socialfix.  Weiner Decl., Ex. H ¶ 10; *see* Socialfix 56.1 ¶ 43.  Nevertheless, Socialfix contends, Unicorn continued to "string [Socialfix] along," allowing it to keep working for Unicorn on the understanding that the two were still in a business relationship.  Socialfix 56.1 ¶ 44; *see* Weiner Decl., Ex. O at 1 (September 15, 2018 text message from Bodik to Tateossian

assuring Tateossian that "[n]obody has a problem with You or Socialfix"); Tateossian Tr. at 155 ("I was never told to stop working either.  So I continued to work.").

By late September 2018, although it had not been told as much by Unicorn, Socialfix became suspicious that it was being pushed out of the relationship and would not be paid for the services it had provided.  Socialfix 56.1 ¶ 45; *see* Tateossian Tr. at 154 ("They began doing covert things that indicated to me that they were going to be either getting rid of me, replacing me with another agency that can work for them for free.  They were taking all of my work and repurposing it for whatever they needed to do with it, and they were going to cut me out of the deal."); Tateossian Tr. at 154–55 ("[I]t became clear to me that they were never going to sign their stock agreement.  I asked for it multiple times.").[9]

### a.  *Socialfix's Trademark Application*

Apparently to protect what she viewed as her rights to the Unicorn logo that Socialfix had designed for Unicorn, on October 3, 2018, Tateossian applied for the mark "UNICORN" with the U.S. Patent and Trademark Office ("USPTO").  *See* Jayaram Decl., Ex. N ("Trademark App.").  Unicorn characterizes this application as fraudulent.  It argues that Tateossian filed the application knowing that Unicorn was, at the time, using the mark in commerce.  Unicorn 56.1 ¶¶ 48–51.  Socialfix denies that the application was fraudulent.  It maintains that, acting on the advice of counsel and other advisers, Tateossian believed that she owned the mark given that Socialfix designed the logo and, in her view, had not been paid in full for that work.  Socialfix Reply 56.1 ¶¶ 48–51.  Tateossian later withdrew the application.  *See* Tateossian Tr. at 123.

---

[9] Although this fact does not appear material, Unicorn alleges, and Socialfix does not deny, that Tateossian somehow obtained access to internal Unicorn emails in October 2018 and confirmed her fears that Unicorn intended to end its relationship with Socialfix.  Unicorn 56.1 ¶¶ 28–29; Socialfix Reply 56.1 ¶¶ 28–29.

b.      *Socialfix's October 9, 2018 Demand Letter*

On October 9, 2018, counsel for Socialfix sent a demand letter to Unicorn seeking payment for services rendered.  JSF ¶ 10; Socialfix 56.1 ¶ 47; *see* Jayaram Decl., Ex. I ("Oct. 9 Ltr.").  Unicorn calls the letter a "shake down."  Unicorn 56.1 ¶ 31.  Socialfix contends that its letter was intended only to secure compensation for services rendered.  Socialfix Reply 56.1 ¶ 31.  That letter alleged that, although Unicorn had originally agreed to pay Socialfix $75,000 per month for its services, "[o]ver the course of the past year," the parties had also agreed that Unicorn would issue Socialfix "1,250,000 shares or the equivalent percentage of value in the Unicorn to Socialfix" in exchange for its services.  Oct. 9 Ltr. at 1.  The letter also alleged that Unicorn had repeatedly confirmed its commitment to execute a shareholder purchase agreement granting Socialfix equity in Unicorn, but had failed to do so, or to compensate Socialfix in any other way.  *Id.* at 2.  Socialfix's letter demanded $1,651,693.04 in cash payment.  *Id.* at 3.

In support, the letter attached dozens of invoices, purporting to back up the $1.7 million figure the letter demanded.  *See* Unicorn 56.1 ¶¶ 34–45; Weiner Decl., Ex. G ("Socialfix Invoices").  Socialfix had not previously sent these invoices to Unicorn, and Unicorn had never agreed to the rates set forth therein.  Unicorn 56.1 ¶ 35; *see* Socialfix 56.1 ¶ 35.  Unicorn disputes the invoices' accuracy and reliability.  Unicorn 56.1 ¶¶ 27–28.  Asked whether the invoices reflected any services that Socialfix did not provide, Gelinas testified, "I can't answer that."  Gelinas Tr. at 58 ("Q. So you don't know one way or another whether or not they did provide these service[s]?  A. Correct.").  Bodik testified that "that thick set of invoices with those inflated prices and hours, we believed that that was a shakedown."  Bodik Tr. at 192–93.  But when asked about the services themselves, Bodik was unable to identify any listed work that Socialfix had not actually completed.  *See id.* at 80 ("I have no reason to believe that they would falsify any work done in here.").

Tateossian admitted that Socialfix created the invoices—which purport to reflect services provided between October 2017 and September 2018—in September 2018, and that none were created contemporaneously with the work they described.  *See* Tateossian Tr. at 156 (Q. "And then when you didn't receive the stock, you went back and created these invoices?  A. Yes."). She also conceded that each invoice provides only "an estimate," or "a ballpark what it costs." *Id.* at 164, 178.  Some invoices bill for more than 24 hours by Tateossian in a single day.  *See id.* at 161–62.  Others took "an estimation of an average [] month" and spread it out over each day that month in equal amounts.  *Id.* at 178.  Tateossian conceded that she does not "think they are correct," but explained that the invoices were incorrect only in that "a lot is missing from the invoices" because they left out work that Socialfix likely provided.  *Id.* at 160.

The October 9 letter also asserted Socialfix's rights in certain "property," warning that "all content, digital materials, marketing materials, logos, brand materials and/or other information and/or materials created by Socialfix are solely and exclusively Socialfix's property."  Oct. 9 Ltr. at 3.  It demanded that Unicorn cease and desist using and displaying that property until Unicorn paid the alleged $1.7 million debt.  *Id.*

### c.  *Unicorn's October 15, 2018 Response*

On October 15, 2018, Unicorn responded to Socialfix's letter.  *See* JSF ¶ 11; Socialfix 56.1 ¶ 50; Weiner Decl., Ex. R ("Oct. 15 Ltr.").  Its response called Socialfix's claim to more than one million shares in Unicorn "remarkable," characterized the letter as "shaking down" Unicorn, and denied that Unicorn owed Socialfix anything.  Oct. 15 Ltr. at 2 ("While Unicorn remains open to discussing an arrangement whereby Socialfix is provided with equity in exchange for the provision of ongoing services once the show is produced, there is no such agreement in place, and thus your claim to the equity is completely without merit.").

Unicorn also denied that Socialfix owned any intellectual property related to *The Unicorn*, including the Unicorn logo. *Id.* at 3. The letter claimed that "Unicorn paid $5,000.00 for Socialfix's development of the logo and related items." *Id.*

> d.    *Socialfix's October 25, 2018 Reply*

On October 25, 2018, Socialfix's counsel replied by letter. JSF ¶ 12; Socialfix 56.1 ¶ 52; Weiner Decl., Ex. S ("Oct. 25 Ltr."). The letter reiterated Socialfix's claim of entitlement to payment for past services rendered and again demanded $1.7 million in cash compensation. Oct. 25 Ltr. at 2. It also reiterated its threats about the Unicorn branding and intellectual property. *Id.* at 3. Claiming ownership of all such materials, Socialfix demanded that Unicorn prove otherwise by the next day, or else Socialfix would "be forced to take legal action and notify all third parties who are publishing its works to cease and desist from doing so." *Id.* That evening, Unicorn's counsel responded by email, stating that Unicorn (1) had learned of Tateossian's allegedly fraudulent trademark application; (2) considered Socialfix's warning about third parties to evince an intent to tortiously interfere with Unicorn's business relationships; and (3) would be unable to respond to Socialfix's demand for proof of ownership over the brand materials by the next day, and would instead respond the next week. Weiner Decl., Ex. T ("Oct. 25 Email").

> **8.    Socialfix's October 28, 2018 Cease-and-Desist Letter to Bloomberg**

On October 30, 2018, Unicorn was scheduled to serve as the sole paid sponsor for a "bespoke crowdfunding event" with Bloomberg (the "Future of Crowdfunding Event") to promote *The Unicorn*. Unicorn 56.1 ¶ 25. Unicorn claims that this event was to take place pursuant to its sponsorship agreement with Bloomberg, and that it had paid $150,000 to serve as the event's sole sponsor, to promote the show and its brand. *See id.* ¶ 61.

On October 28, 2018, two days before the event, Socialfix, following through on its October 25 threat, sent Bloomberg a cease-and-desist letter.  JSF ¶ 12; Socialfix 56.1 ¶ 56; *see* Weiner Decl., Ex. U ("Bloomberg Ltr.").[10]  That letter stated that Socialfix had registered the Unicorn mark with the USPTO, was the owner of that mark, and that Bloomberg and Unicorn were unauthorized to use or display the mark.  Bloomberg Ltr. at 1–2.  It advised Bloomberg that any display of the mark would support trademark infringement, dilution, unfair competition, and other liability.  *Id.* at 2.  Finally, it demanded that Bloomberg cease and desist from any further use or display of the mark, and provide written confirmation to that effect by October 30, 2018— the date of the Future of Crowdfunding Event.  *Id.*

The evidence about Socialfix's motives for sending this letter is as follows.  Tateossian testified that, when she sent the letter, she believed that she owned the UNICORN mark and had a right to protect it.  Socialfix 56.1 ¶ 58.  Krysinski testified otherwise.  He stated that the letter was "an attempt to have them [Unicorn] come back to the table and let us [Socialfix] know what the hell was going on."  *Id.* ¶ 57.  "[W]e thought, we've called, we've e-mailed, we've sent a legal letter following invoices to say, guys, do you not understand what you're doing right now, we have a promise that you are now completely blowing up, come back and talk to us." Krysinski Tr. at 35–36; *see id.* at 36 (asked the reason for the letter, he testified "[b]ecause they did not respond to the initial claim we were going to do that, which meant they had no intention of calling us about this."); *id.* at 42 (Socialfix sent letter to Bloomberg "to get Mr. Gelinas and Mr. Bodik to pick up the phone . . . .  I don't know what else we could have done . . . .").  Although he equivocated slightly on the point, Krysinski also confirmed that Socialfix did not in

---

[10] Socialfix sent a similar letter to a company called Variety.  That letter does not appear pertinent to the instant motions.  *See, e.g.*, Krysinski Tr. at 44.

fact intend to sue Bloomberg if it flouted the letter.  *See id.* at 44 ("Q. Were you intending on

suing Bloomberg and Variety if they didn't cease and desist?  A. No. . . .  [C]an I retract on the

previous statement to say, I believe when you file a cease and desist, if they proceeded to

actually use the logo, the intention of that was to carry forward with whatever the promise was,

but that is at the discretion of us at the point as to whether or not to do that . . . .  [Y]ou're

predicting legal conclusion to say that we were going to sue afterwards, I say absolutely not.  I

don't think we would have, but I understood the threat was to . . . get the other parties to engage.").

After receiving Socialfix's cease-and-desist letter, Bloomberg removed all Unicorn

branding from the Future of Crowdfunding event.  Unicorn 56.1 ¶ 60.  Thus, according to

Unicorn, it paid Bloomberg $150,000 to be the sole sponsor at the event but lost all or most of

the benefit of that investment.  *Id.* ¶ 61; *see* Gelinas Tr. at 152; Bodik Tr. at 157 ("We weren't

able to use our logo, anything on the marketing side sending out to their people.  Nothing was

branded with unicorn, so that was detrimental.").[11]

### 9.    Fallout with Bloomberg

After October 30, 2018, Unicorn's relationship with Bloomberg deteriorated.  Gelinas

testified that the relationship became "[t]enuous, to say the least" in the wake of the letter.

Gelinas Tr. at 133.  He also attributed that decline to damage caused by Socialfix.  *See id.* at 136

("Q. How was it damaging?  A. Relationships that we had built from an investment of time from

Bloomberg, their team, not returning calls, not returning e-mails . . .  It was damaging big

---

[11] Socialfix recognizes that Gelinas and Bodik each testified about the harm to Unicorn from
Bloomberg's decision to remove Unicorn branding from the Future of Crowdfunding Event.  But
it emphasizes that Unicorn has not adduced "document or tangible evidence" corroborating this
harm.  *See* Socialfix Reply 56.1 ¶¶ 60–61.  This argument, of course, elides the fact that the
testimony of a witness with personal knowledge is competent to establish such points; evidence
need not be in tangible or documentary form.  And Socialfix does not contend that Gelinas or
Bodik lack personal knowledge on these points.  *See* Fed. R. Evid. 602.

time."). Bodik testified similarly, noting that "[i]t's more of a cold relationship, even though there still is some sort of a relationship. It's been affected tremendously." Bodik Tr. at 155.

The parties dispute the effect of Socialfix's cease-and-desist letter. Socialfix notes, for example, that as of Gelinas's deposition, Bloomberg had not yet expressly confirmed that it would not run *The Unicorn*. Socialfix 56.1 ¶ 64. Unicorn, however, has since provided a declaration from Bodik stating that Bloomberg now "is no longer working with Unicorn in any capacity," and that "Unicorn has been forced to start over by trying to find a new network." Unicorn Reply 56.1 ¶ 64; *see* Weiner Decl., Ex. G ("Bodik Decl.") ¶ 21. Socialfix also argues that Unicorn has not adduced evidence of Bloomberg's views on this matter, and has offered only hearsay to support its contentions that Bloomberg ceased working with Unicorn *because of* Socialfix's letter. *See* Socialfix 56.1 ¶¶ 69–70. Socialfix theorizes that the relationship between the two may have broken down as a result of a summer 2018 incident in which Carl Heil, a Unicorn co-founder, made an inappropriate comment to a Bloomberg employee, or for other intervening reasons. Socialfix 56.1 ¶¶ 71–72. Unicorn counters that incident was a non-event, and that the relationship between Unicorn and Bloomberg worsened immediately after Socialfix's October 2018 cease-and-desist letter. *See, e.g.*, Unicorn Reply 56.1 ¶¶ 71–72; Bodik Tr. at 153 ("The relationship with Bloomberg has been definitely impacted. . . . [W]hat was a good relationship, immediately after the cease and desist, because of legal getting involved, it was a huge detriment to our relationship . . . ."). Last, Socialfix contends that Unicorn and Bloomberg continued to work together after the cease-and-desist letter was sent. Socialfix 56.1 ¶ 73. Unicorn counters that, after the letter, it and Bloomberg carried out their remaining contractual obligations to one another, but not more, and that Bloomberg has since stopped working with Unicorn altogether. Unicorn Reply 56.1 ¶ 73.

### B.        Procedural History

On October 31, 2018, Unicorn commenced this action by filing a complaint and a motion for a preliminary injunction against Socialfix, Tateossian, and Ossian.  *See* Compl.  On November 16, 2018, the Court entered a consent order, proposed by the parties, putting in place preliminary injunctive relief to maintain the status quo pending final adjudication of the case. Dkts. 24–25.  On December 6, 2018, Socialfix filed its answer and counterclaims.  Dkt. 27.

On January 15, 2019, Unicorn moved for a more definite statement, and on January 16, 2019, Socialfix filed an amended answer and counterclaims.  Dkts. 31–32.  On January 30, 2019, Unicorn moved to dismiss Socialfix's counterclaims.  Dkt. 34.  On June 12, 2019, the Court denied that motion.  Dkt. 43.  On June 26, 2019, Unicorn filed an answer to Socialfix's counterclaims.  Dkt. 44.

On October 23, 2019, Socialfix sought leave to file a third-party complaint against Bodik and Gelinas on an alter-ego theory of liability.  Dkt 52.  Unicorn did not oppose that motion, on the condition that no new fact discovery would ensue; the Court granted it on the same day. Dkt. 53.  On October 24, 2019, Socialfix filed the third-party complaint.  Dkt. 54.

On December 17, 2019, with discovery complete, the Court held a pre-motion conference.  On December 20, 2019, Bodik and Gelinas answered the third-party complaint. Dkt. 70.  On January 15, 2020, the parties filed a joint statement of undisputed material facts. *See* JSF.  On March 6, 2020, Socialfix filed a motion for partial summary judgment, Dkt. 75; a memorandum of law in support, Socialfix Mem.; a Local Rule 56.1 Statement, *see* Socialfix 56.1; and the declaration of Joshua L. Weiner, Esq., with accompanying exhibits.  On March 18, 2020, Unicorn filed a cross-motion for partial summary judgment and opposition to Socialfix's partial motion, Dkt. 80; a memorandum of law in support, Dkt. 81 ("Unicorn Mem."); a counter-statement to Socialfix's Local Rule 56.1 Statement, *see* Unicorn Reply 56.1; its own Local Rule

56.1 Statement in support of its motion, *see* Unicorn 56.1; and the declaration of Vivek Jayaram, Esq., with accompanying exhibits.  On April 15, 2020, Socialfix filed a response in further support of its motion and in opposition to Unicorn's motion, Dkt. 88 ("Socialfix Resp."); a counter-statement to Unicorn's Local Rule 56.1 Statement, *see* Socialfix Reply 56.1; and Weiner's reply declaration, with accompanying exhibits.  On April 29, 2020, Unicorn filed a reply in further support of its motion, Dkt. 91 ("Unicorn Reply"), and Jayaram's reply declaration.

## II.     Legal Standard

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## III.    Discussion

Each side has moved for summary judgment on a subset of claims.  The Court first addresses the motions addressed to Unicorn's claims, and then those addressed to Socialfix's counterclaims.

Unicorn has brought claims for (1) false designation of origin under the Lanham Act; (2) tortious interference with business relations under New York common law; and (3) deceptive acts and practices under N.Y. Gen. Bus. L. § 349.  All three are at issue here.  Socialfix has moved for summary judgment on the second and third, arguing that there is insufficient evidence to permit a reasonable jury to find for Unicorn on either.  Unicorn has moved for summary judgment on its Lanham Act claim and for summary judgment (though solely as to liability) on its tortious interference claim.

Socialfix has brought counterclaims for (1) breach of contract; (2) unjust enrichment; (3) quantum meruit; and (4) promissory estoppel.  The second and third counterclaims are implicated by the pending motions.  Socialfix has moved for summary judgment on each, though solely as to liability; it concedes that disputes of material fact as to the value of the services it provided to Unicorn preclude summary judgment as to damages.  Unicorn has not moved for summary judgment on any of Socialfix's counterclaims.

The Court addresses these arguments in turn.

### A.    Unicorn's Claims

#### 1.    False Designation of Origin

Unicorn's claim for false designation of origin is under Section 43(a) of the Lanham Act, which provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .
>
> shall be liable in a civil action . . . .

15 U.S.C. § 1125(a)(1).

A plaintiff must, as a "threshold burden," "show 'use in commerce' as an element of an infringement claim." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 305–06 (2d Cir. 2013) (citing 15 U.S.C. §§ 1114, 1125(a)(1)); *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009) (plaintiffs must show "defendant has made 'use in commerce' of the plaintiff's trademark as the term 'use in commerce' is defined in 15 U.S.C. § 1127").  In addition, to prevail, a plaintiff "must show, first, that he or she has a valid mark that is entitled to protection, and, second, that the defendant's actions are likely to cause confusion as to the origin or sponsorship of the defendant's goods." *See LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 649 (S.D.N.Y. 2016) (citing *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 224 (2d Cir. 2012)).

In pursuing summary judgment, Unicorn argues that there is no genuine dispute that (1) it owns the Unicorn mark, a protected trademark; and (2) Socialfix's submission of an allegedly fraudulent trademark application and sending of the cease-and-desist letter to Bloomberg were

likely to cause confusion between the marks.  Socialfix does not contest the validity of the

Unicorn mark.  But it responds that Unicorn has not made a threshold showing of a use "in

commerce" by Socialfix, and that genuine disputes of material fact preclude summary judgment

as to likelihood of confusion.

For the following reasons, the Court holds with Socialfix and denies Unicorn's summary

judgment motion on its Lanham Act claim.

Summary judgment for Unicorn is unwarranted on this claim because there are, at a

minimum, genuine issues of material fact as to whether Socialfix ever used the Unicorn mark in

commerce.  Unicorn must show that the "defendant has made 'use in commerce' of the

plaintiff's trademark as the term 'use in commerce' is defined in 15 U.S.C. § 1127." *Rescuecom*,

562 F.3d at 127.[12]  Under that provision:

> The term 'use in commerce' means the bona fide use of a mark in the ordinary
> course of trade, and not made merely to reserve a right in a mark.  For purposes of
> this chapter, a mark shall be deemed to be in use in commerce—
>
> > (1) on goods when—

---

[12] In fact, as the Second Circuit explained in a lengthy "Appendix" to its *Rescuecom* decision, there are good reasons to doubt that Congress intended § 1127's definition of "use in commerce" to apply in the infringement context, rather than solely in the context of registration of marks. *See Rescuecom*, 562 F.3d at 131–41 (noting, *inter alia*, that the requirement of a "bona fide use" leads to absurd results in the infringement context and that the authors of the original panel decision applying § 1227 to infringement claims agreed with that assessment).  But that Appendix is self-described "dictum and not a binding opinion of the court," *id.* at 140, and the Circuit has not overruled its precedent holding that § 1227 applies to *all* Lanham Act claims.  *See Can't Live Without It, LLC v. ETS Express, Inc.*, 287 F. Supp. 3d 400, 414–15 (S.D.N.Y. 2018) (citing *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 407 (2d Cir. 2005)).  This doctrinal debate is of no moment here.  The *Rescuecom* Appendix concluded that, were it not bound by precedent, the panel likely would have resolved the confusing situation presented by § 1227 by treating the second, but not the first, sentence of the "use in commerce" definition as applicable to infringement claims.  Applying that standard would yield the same result that the Court reaches here.

> (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
>
> (B) the goods are sold or transported in commerce, and
>
> (2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

15 U.S.C. § 1227.  Here, Unicorn cites three actions by Socialfix that ostensibly satisfy this element: (1) Socialfix's attempt to register the Unicorn mark with the USPTO; (2) Socialfix's sending the cease-and-desist letter to Bloomberg; and (3) Socialfix's representations in its USPTO application and in this litigation that it used the Unicorn mark in commerce.  Far from clearly establishing this element, it is doubtful that any of those actions constitutes a "use in commerce."

First, Socialfix's trademark application falls outside the scope of a "use in commerce" as defined in § 1227.  Such an application seeks "merely to reserve a right in a mark," and does not involve goods or services sold or rendered in commerce.  *Id.*; *see Omega S.A. v. Omega Eng'g, Inc.*, 396 F. Supp. 2d 166, 174 (D. Conn. 2005) ("Neither the application for a trademark registration nor the existence of a pending trademark application give rise to a claim of trademark infringement or false designation of origin."); *Macia v. Microsoft Corp.*, 152 F. Supp. 2d 535, 539 (D. Vt. 2001) ("The only alleged use of the mark is Intuit's filing of an ITU trademark application.  Unless and until Intuit uses the mark in the course of trade, to identify actual goods for sale or transport, it cannot be subject to suit for trademark infringement under § 1125(a).") (collecting cases).  Unicorn has not pointed to countervailing authority.  *See* Unicorn Reply at 8–9.

Second, for similar reasons, the October 28, 2018 cease-and-desist letter was not a "use in commerce" of the Unicorn mark.  Sending that letter was not in Socialfix's "ordinary course of trade," and did not relate to a sale of goods or to the sale or advertising of any services that Socialfix rendered in commerce.  15 U.S.C. § 1227.  Unicorn has cited no authority to the effect that sending a cease-and-desist letter, absent other evidence of use, can constitute a "use in commerce" under the Lanham Act.  *See* Unicorn Reply at 8–9.

Perhaps recognizing that the above two uses are unlikely to meet its burden under §§ 1125 and 1127 of the Lanham Act, Unicorn's reply shies away from these allegations.  *See id.* at 8–9.  Instead, it focuses on a single admission in Socialfix's reply to Unicorn's Local Rule 56.1 statement.  *Id.*  There, Unicorn asserted that Socialfix "claimed to have used the mark in commerce up until the point of sending" the October 9, 2018 letter, Unicorn 56.1 ¶ 56, citing in support Tateossian's deposition testimony that "I did use the Unicorn mark as part of Unicorn," Tateossian Tr. at 243–44.  Socialfix's response to that statement was: "Admit."  Socialfix Reply 56.1 ¶ 56.  Unicorn argues that this statement unavoidably establishes the "use in commerce" element of its Lanham Act claim.  That is wrong for at least two reasons.  First, the Local Rule 56.1 paragraph at issue stated only that Socialfix "*claimed* to have used the mark in commerce."  Unicorn 56.1 ¶ 56 (emphasis added).  Even accepting that fact as undisputed, Socialfix's claim does not establish that Socialfix *did* use the mark in commerce.  Second, Tateossian's deposition testimony does not say quite what Unicorn represents.  She attested only that she used the mark in the context of her work with Unicorn.  She said nothing about any "use in commerce"—a statutory term of art—or otherwise answer that legal question.  Tateossian Tr. at 243–44.

The record presented to the Court, in sum, far from establishing this element, appears to lack any actual evidence showing that Tateossian or Socialfix used the Unicorn mark in commerce as the Lanham Act defines that term.  Because the only motion on this claim is Unicorn's, the Court has no occasion to resolve whether a summary judgment motion by Socialfix on this claim would have prevailed.  For now, the Court need hold only that, viewing the evidence presented in the light most favorable to Socialfix, there is at least a genuine dispute about whether Socialfix's use of the Unicorn mark could support liability for false designation of origin.  The Court therefore denies Unicorn's motion for summary judgment on that claim.[13]

### 2.      Tortious Interference with Business Relations

Each party has moved for summary judgment, in whole or part, on Unicorn's claim for tortious interference with business relations under New York law.[14]  "To state a claim for this tort under New York law, four conditions must be met: (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship."  *Catskill Dev., LLC v. Park Place Ent. Corp.*, 547 F.3d 115, 132 (2d Cir. 2008).  "While a defendant's commission of a 'crime or an independent tort' clearly constitutes wrongful means, such acts are not essential to find wrongful means."  *Id.* (quoting *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 189 (2004)); *see Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 206 (2d Cir. 1998).

---

[13] The parties separately dispute whether Unicorn's evidence as to the likelihood of customer confusion suffices to entitle it to summary judgment.  Having denied Unicorn's motion based on the threshold requirement of a use in commerce, the Court does not have occasion to address the likelihood of confusion.  Were this claim to proceed to trial, the Court would benefit from a more fulsome development of the evidence on that element than has been provided to date.

[14] The parties' briefs assume that New York law governs this case.  That suffices to establish the applicable choice of law.  *See Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009).

Only the last two elements are at issue.  Unicorn seeks summary judgment, solely as to liability, on this claim.  It argues that there is no genuine dispute that Unicorn had a business relation with Bloomberg, which Socialfix knew of and wrongfully interfered with by sending the October 28, 2018 cease-and-desist letter.[15]  Socialfix also moves for summary judgment on this claim.  It does not dispute that Unicorn and Bloomberg had a business relationship about which Socialfix knew.  But it argues that Unicorn has not adduced evidence that Socialfix's actions proximately harmed that relationship.  Socialfix also opposes Unicorn's motion, arguing that there are genuine disputes of material fact as to the wrongfulness of Socialfix's actions.

The Court denies both motions on this claim.

### a.   *Wrongfulness of Socialfix's Actions*

To establish tortious interference with business relations under New York law, "the plaintiff must show that defendant's conduct was not 'lawful' but 'more culpable.'"  *Carvel Corp.*, 3 N.Y.3d at 190.  Although "as a general rule," a defendant's conduct must amount to a "crime or independent tort" to support liability for tortious interference with business relations, an exception to this rule "has been recognized where a defendant engages in conduct for the *sole* purpose of inflicting intentional harm on plaintiffs" or employs "wrongful means."  *Id.* at 190, 192 (emphasis added) (citation omitted); *see, e.g.*, *Medcalf v. Walsh*, 938 F. Supp. 2d 478, 490 (S.D.N.Y. 2013); *RFP LLC v. SCVNGR, Inc.*, 788 F. Supp. 2d 191, 196 (S.D.N.Y 2011).  Unicorn does not argue that Socialfix's sole intention, when it sent its cease-and-desist letter to Bloomberg, was to harm Unicorn.  Instead, it argues that Socialfix acted through "improper or wrongful means" in doing so.  *See* Unicorn Mem. at 15–16; Unicorn Reply at 3.

---

[15] Unicorn concedes that material disputes of fact exist about the damages it sustained from that interference.

Even when a defendant's sole purpose was not to injure the plaintiff, New York courts have held that the use of "wrongful means" can support a claim for tortious interference.  *See, e.g.*, *Carvel Corp.*, 3 N.Y.3d at 192; *see also Catskill Dev.*, 547 F.3d at 132 (third element of tortious interference claim met where defendant used "dishonest, unfair, or improper means").  Wrongful means "include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure."  *Carvel Corp.*, 3 N.Y.3d at 191 (quoting Restatement (Second) of Torts §§ 767 cmt. c, 768 cmt. e).

"A baseless threat of litigation may constitute wrongful means."  *Lombardo v. Dr. Seuss Enters., L.P.*, No. 16 Civ. 9974 (AKH), 2017 WL 1378413, at *5 (S.D.N.Y. Apr. 7, 2017).  But that is true only in two circumstances: when (1) the defendant "'has no belief in the merit of the litigation,' *or* (2) the defendant otherwise 'institutes or threatens to institute litigation in bad faith, intending only to harass the third parties and not to bring [its] claim to definitive adjudication.'"  *Ace Arts, LLC v. Sony/ATV Music Publ'g, LLC*, 56 F. Supp. 3d 436, 451 (S.D.N.Y. 2014) (emphasis added) (quoting *RFP*, 788 F. Supp. 2d at 197); *see Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 75 (2d Cir. 1986).

Depending on the evidence credited, a finder of fact could arrive at different conclusions as to Socialfix's motivation, or motivations, for sending the cease-and-desist letter.  On one hand, Socialfix co-founder Krysinski testified at length that Socialfix's purpose in sending the cease-and-desist letter was not to protect its rights in the UNICORN mark.  Rather, he admitted, the letter "was sent as an attempt to have [Unicorn] come back to the table and let us know what the hell was going on . . . .  [W]e have a promise that you are now completely blowing up, come back and talk to us."  Krysinski Tr. at 35–36.  Krysinski further testified that Socialfix did not intend to follow through on its threat to sue Bloomberg.  When asked, "[w]ere you intending on

suing Bloomberg . . . if they didn't cease and desist?," he responded: "No." *Id.* at 44.[16]  On this

basis, Unicorn argues that Socialfix determinably had no intention of bringing its claim "to

definitive adjudication," and that in sending the letter, it was acting "in bad faith, intending only

to harass" Bloomberg and Unicorn.  *Ace Arts*, 56 F. Supp. 3d at 451; *see* Unicorn Reply at 3

("Socialfix admits that the purpose of sending the [letter] was *not* a legitimate attempt to protect

its trademark rights.").

On the other hand, in her testimony, Tateossian supplied a contrary explanation about her

reasons for sending the letter.  She testified that Bloomberg "needed to be informed that my IP

was stolen . . . [b]ecause they were using my work."  Tateossian Tr. at 85.  She also testified that

she sent the letter because she "had to find a way to protect what was my work, my IP."  *Id.*

at 87; *see id.* at 88 ("Q. And do you still believe that [IP] was yours?  A. Yes.").  Asked the basis

for her belief in her and Socialfix's ownership of the UNICORN mark, she testified that

"[e]veryone [she] spoke to, everyone that [she] asked for consultation" told her that she had

rights to the mark.  *Id.* at 88; *see id.* (identifying attorneys as well as "investors that I brought

into the venture, Tracy McWilliams, and other associates I spoke to.").[17]

---

[16] Socialfix emphasizes that Krysinski quickly sought to walk back this statement by noting that, in general, "when you file a cease and desist, if they proceed to actually use the logo, the intention of that was to carry forward with whatever the promise was."  Krysinski Tr. at 44.  But he then reiterated that, although it was within Socialfix's "discretion . . . at th[at] point," in terms of "predicting legal conclusion to say that we were going to sue afterwards[,] I say absolutely not.  I don't think we would have, but I understood the threat was to, once again, get the other parties to engage."  *Id.* at 44–45.  Krysinski's assembled testimony easily permits the finding that, while Socialfix understood it theoretically *could have* sued Bloomberg, it did not have any intention of doing so, and was seeking instead to prod Unicorn to engage with it over the compensation to which Socialfix claimed entitlement.

[17] Unicorn objects to Socialfix's use of what Unicorn construes as an advice-of-counsel defense, given that Socialfix has invoked the attorney-client privilege throughout discovery.  *See* Unicorn Reply at 4–6.  Unicorn is correct that Socialfix's refusal to permit discovery into its attorney-

The summary judgment record does not provide the Court a basis on which to choose between these two strains of testimony, or to determine that Socialfix acted with dual motives. *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter . . . ." (quoting *Anderson*, 477 U.S. at 249)).   There is evidence sufficient to support that Socialfix improperly used legal threats to achieve the unrelated goal of securing payment for its prior services.   But there is also evidence sufficient to support that Socialfix genuinely sought to protect its rights in the UNICORN mark, even though those rights may have ultimately proven illusory.   *Cf. Metrokane, Inc. v. Built NY, Inc.*, No. 06 Civ. 14447 (LAK) (MHD), 2008 WL 11397767, at *31 (S.D.N.Y. Sept. 3, 2008) (in patent context, "the mere fact that the [defendant] was mistaken in believing that there was merit to his assertion of infringement is not tantamount to bad faith." (citing *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 310 F.3d 1360, 1370–71 (Fed. Cir. 2002))).   Viewing the evidence in the light most

---

client communications bars it from pursuing such a defense.  *See, e.g.*, *E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 296 (S.D.N.Y. 2000) ("Having blocked his adversary from conducting discovery on this issue, he will not now be heard to advance reliance on counsel."), *aff'd*, 4 F. App'x 81 (2d Cir. 2001) (summary order).  In pursuing summary judgment, Socialfix similarly may not rely on the sole—unproduced—letter from counsel to Tateossian that Socialfix has identified as documentary support for its claim to have relied on counsel.  *See* Weiner Reply Decl., Ex. C; Jayaram Reply Decl., Ex. A at 8–9 (Socialfix objections on privilege grounds).  The Court does not have occasion here to consider whether, with fact discovery having closed, Socialfix may yet revive its ability to pursue such a defense at trial.  Such would require Socialfix to make "full and immediate disclosure of all legal opinions pertaining to" Socialfix's right to the UNICORN mark, *Vicinanzo v. Brunschwig & Fils, Inc.*, 739 F. Supp. 891, 894 (S.D.N.Y. 1990), and the Court to reopen discovery on this defense.

However, Tateossian's testimony about her intentions and state of mind remains admissible and, if credited, probative.  She testified that in asserting her rights to the UNICORN mark in the letter to Bloomberg, she relied—apart from the advice of counsel—on the advice of investors and other associates and that she genuinely believed the mark to have belonged to her and Socialfix.

favorable to Socialfix (the nonmoving party on this element), whether Socialfix acted in bad faith cannot be resolved on summary judgment.  It requires resolution by the trier of fact.

     *Universal City Studios*, on which Unicorn largely relies, is not to the contrary.  There, the Second Circuit affirmed a grant of summary judgment on a fuller record which left no doubt as to the defendant's bad faith.  *Universal City Studios*, 797 F.2d at 75.  Counter-claimant Nintendo alleged that Universal City Studios had tortiously interfered with its *contractual* relations by sending cease-and-desist letters to Nintendo's licensees, asserting Universal's right in the "King Kong" trademark and that Nintendo's use and license of trademarks related to "Donkey Kong" infringed that right.  *Id.* at 74.  The district court granted Nintendo summary judgment on that claim, finding that "Universal knew that it did not have a trademark in King Kong, and that it threatened suit not to adjudicate its trademark claim, but to coerce others into sharing their Donkey Kong profits."  *Id.* at 75.  In affirming, the Second Circuit noted the substantial evidence of Universal's bad faith.  First, a prior litigation, of which Universal's president "personally knew the facts, background and nuances," had established other entities' rights over King Kong images, such that the president, who was an attorney, "must have known" that those rights "were irreconcilable with the existence of any universal trademark rights in King Kong."  *Id.* at 76.  Second, Universal's president, at his deposition, "was unable to identify the nature of Universal's rights in King Kong."  *Id.*  Third, Universal had engaged in "less than vigorous efforts" to enforce its rights other than the cease-and-desist letters at issue, despite evidence of other third-parties' uses of the mark.  *Id.*  Fourth, the evidence showed that Universal's former general counsel and a vice president of a relevant Universal subsidiary had both "concluded that Universal had no rights to license King Kong."  *Id.*  Last, in each relevant case, Universal "simply threatened" litigation but then quickly invited Nintendo's licensees to settle.  *Id.*

Unicorn has not adduced comparable evidence.  It mostly relies on Krysinski's testimony on Socialfix's intent to follow through on its threats of litigation.  *See* Unicorn Mem. at 16.  It also cites the fact that Socialfix sent the cease-and-desist letter only after it had demanded payment from Unicorn for its past services.  *See* Unicorn Reply at 4.  As to the latter evidence, the demand letters that Socialfix had previously sent included assertions of Socialfix's rights in the UNICORN mark and other related intellectual property.  *See* Oct. 9 Ltr. at 3 (asserting rights in "all content, digital materials, marketing materials, logos, brand materials and/or" any other materials created by Socialfix); Oct. 25 Ltr. at 3 (reiterating same and noting that Unicorn had "continued to use [Socialfix's] works despite being instructed that you have no permission or authority to do so").  These letters can be argued to reflect Socialfix's durable and authentic belief, whether or not correct, that it owned the UNICORN mark.  In all events, the evidence adduced does not conclusively show that Socialfix "knew that it did not have a trademark in" Unicorn.  *Universal City Studios*, 797 F.2d at 75.  Because a reasonable factfinder could conclude that Socialfix had a reasonable belief in the validity of its claims against Unicorn and Bloomberg, and did not send the cease-and-desist letter solely to harass either party, the Court cannot enter summary judgment against Socialfix on this claim.

### b.      *Harm to Business Relationship*

In support of its motion for summary judgment, Socialfix argues that there is no evidence showing that the cease-and-desist letter caused harm to Unicorn's business relations.  That is wrong.  Even setting aside items that Socialfix rightly argues are as inadmissible, Unicorn has adduced sufficient evidence on which a reasonable factfinder could find harm to its relationship with Bloomberg.  Accordingly, the Court also denies Socialfix's motion for summary judgment on this claim.

"As to the fourth element—causation and injury—[Unicorn] must show 'that the wrongful acts were the proximate cause of the rejection of [its] proposed contractual relations,' and that it suffered some actual damages, such as lost opportunities for profits on business diverted from it.'" *SourceOne Dental, Inc. v. Patterson Cos.*, 310 F. Supp. 3d 346, 369 (E.D.N.Y. 2018) (first quoting *Pacheco v. United Med. Assocs., P.C.*, 305 A.D.2d 711, 712 (3d Dep't 2003), and then quoting *Mandelblatt v. Devon Stores, Inc.*, 132 A.D.2d 162 (1st Dep't 1987)).

"Injury in this context requires Plaintiffs to show 'that defendants' actions were both a cause-in-fact of [the] lost busines . . . and that the lost business was a foreseeable consequence of defendants' actions.'" *Acad. Orthotic & Prosthetic Assocs. IPA, Inc. v. Fitango Health, Inc.*, No. 19 Civ. 10203 (JPO), 2020 WL 6135762, at *7 (S.D.N.Y. Oct. 16, 2020) (quoting *SourceOne Dental*, 310 F. Supp. 3d at 370); *see State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 171–72 (2d Cir. 2004) ("The defendants cannot prevail on their tortious interference counterclaim unless they 'demonstrate *both* wrongful means *and* that the wrongful acts were the *proximate cause* of the rejection of the plaintiff's proposed contractual relations.'" (quoting *Pacheco*, 305 A.D.2d at 712)).  In showing proximate causation, a plaintiff seeking to recover for tortious interference with prospective business relations must show "that a contract would have been entered into with a prospective [relation] 'but for' defendant's conduct." *Parrott v. Logos Cap. Mgmt., LLC*, 91 A.D.3d 488, 489 (1st Dep't 2012); *see J&R Multifamily Grp., Ltd. v. U.S. Bank Nat'l Ass'n as Tr. for Registered Holders of UBS-Barclays Comm. Mortg. Tr. 2012-C4, Comm. Mortg. Pass-Through Certificates, Series 2012-C4*, No. 19 Civ. 1878 (PKC), 2019 WL 6619329, at *6 (S.D.N.Y. Dec. 5, 2019) (collecting authorities under New York law).

i.      Evidentiary Issues

Before turning to the merits, the Court first addresses several evidentiary issues implicated by this claim.  In arguing that Unicorn has not adduced evidence of harm from Socialfix's alleged tortious interference, Socialfix argues that three categories of evidence must be disregarded: (1) statements about the contents of the purported sponsorship agreement between Unicorn and Bloomberg, which has not been produced and is not in the summary judgment record; (2) hearsay statements from Unicorn employees about Bloomberg's reasons for distancing itself from Unicorn; and (3) Bodik's statements in his declaration about post-discovery events and attached invoices, which were not produced in discovery.  The Court addresses each in turn.

*Sponsorship Agreement:*  In support of its argument on this point, Socialfix notes—and Unicorn does not dispute—that Bloomberg held two Unicorn-sponsored events *after* receiving the cease-and-desist letter from Socialfix.  *See* Socialfix 56.1 ¶ 73; Unicorn Reply 56.1 ¶ 73; Unicorn 56.1 ¶¶ 17–18, 62–63; Socialfix Reply 56.1 ¶¶ 17–18, 62–63.  In response, Unicorn argues that those events were contractually required under a previously made sponsorship agreement between Unicorn and Bloomberg, such that their occurrence does not bear on whether the cease-and-desist letter harmed the business relationship between Unicorn and Bloomberg.  *See, e.g.*, Unicorn 56.1 ¶¶ 62–63; *see* Gelinas Tr. at 136 ("Q. Well, they had you sponsor two other events, right?  A. We were obligated. . . .  We signed a contract with them to sponsor five events.").  Socialfix objects to consideration of that sponsorship agreement because, despite Socialfix's discovery requests seeking it, Unicorn has never produced it, and instead seeks to prove its content solely through the testimony of Bodik and Gelinas.  *See, e.g.*, Socialfix Reply 56.1 ¶¶ 17–18, 62–63; Socialfix Resp. at 10–11.

On the present record, the Court cannot rely on the cited testimony to prove the contents

of the sponsorship agreement.  Although neither party cites it, this dispute implicates Federal

Rule of Evidence 1002 ("Requirement of the Original").  That rule provides that "[a]n original

writing, recording, or photograph is required in order to prove its content unless these rules or a

federal statute provides otherwise."  Fed. R. Evid. 1002.  Several exceptions to Rule 1002 are set

forth in Federal Rule of Evidence 1004, including where "all the originals are lost or destroyed,

and not by the proponent acting in bad faith," and "the writing . . . is not closely related to a

controlling issue."  Fed. R. Evid. 1004(a)–(d).  But "[t]he party seeking to prove the contents of

the writing must establish" that one such exception applies.  *Elliott v. Cartagena*, No. 19 Civ. 1998

(NRB), 2020 WL 4432450, at *4 (S.D.N.Y. July 31, 2020) (quoting *A.F.L. Falck, S.p.A. v. E.A.*

*Karay Co.*, 722 F. Supp. 12, 16 (S.D.N.Y. 1989)).

Unicorn unavoidably seeks to prove the contents of that agreement, given that it argues

that Bloomberg held two additional events with Unicorn only because its written contract with

Unicorn obliged it to do so.  *See, e.g.*, Unicorn Mem. at 17 (Bloomberg only "fulfill[ed] its

remaining contractual obligations to Unicorn").  But Unicorn has not produced that agreement or

a duplicate thereof, *see* Fed. R. Evid. 1002, 1003, or shown (or even argued) that an exception to

the rule applies.  *See* Unicorn Mem. at 16–17; Unicorn Reply at 7.  Accordingly, the Court

cannot rely on the testimony from Unicorn personnel as to the content of that agreement.  *See,*

*e.g.*, *Cutler v. Stop & Shop Supermarket Co.*, 513 F. App'x 81, 83 (2d Cir. 2013) (summary

order) ("We reject Cutler's argument to the extent that it is based on his testimony about the

contents of the book of time sheets because he did not produce those time sheets for the

summary judgment record.").

*Hearsay:*  Next, Socialfix argues that certain statements that Unicorn witnesses have

attributed to Bloomberg representatives are inadmissible hearsay.  *See* Socialfix 56.1 ¶ 70;

Socialfix Reply 56.1 ¶¶ 65–67; Socialfix Mem. at 20 n.9.  The Court agrees and disregards these

statements in resolving the instant motions.

In assessing motions for summary judgment, courts may consider only evidence that

would be admissible at trial.  *See* Fed. R. Civ. P. 56(c)(1)(B), (2).  "Because a party 'cannot rely

on inadmissible hearsay' in support of or in opposition to a motion for summary judgment, 'the

Court must, as a preliminary matter, determine the likely admissibility of the hearsay evidence'

offered by" a party.  *Wilkinson v. Nord Anglia Educ. Ltd.*, No. 17 Civ. 7421 (PAE),

2019 WL 3430662, at *2 n.3 (S.D.N.Y. July 30, 2019) (quoting *Doe ex rel. Doe v. Darien Bd. of

Educ.*, 110 F. Supp. 3d 386, 395 (D. Conn. 2015)).

Some testimony that Unicorn cites as to Bloomberg's reasons for distancing itself from

Unicorn cannot be considered, because it is inadmissible hearsay and/or it consists of testimony

by Unicorn personnel improperly opining, without a foundation on which to do so, about

Bloomberg's subjective motivations.  For example, Bodik testified that Mark Saputo, a

Bloomberg employee, "said that our relationship has been affected because of what transpired

with legal."  Bodik Tr. at 154.  Bodik similarly testified—apparently drawing upon statements

made to him by Bloomberg personnel—that "[o]nce that cease and desist happened, it got up to

legal, we were looked upon as a bad apple, like we were causing problems, we shouldn't be

dealing with them in the same capacity as we were before."  *Id.*  And Gelinas testified that, after

receiving the letter, Bloomberg felt that Unicorn and Socialfix were "partners that create chaos

and issues for their legal team and their company."  Gelinas Tr. at 154.  Asked if he was merely

speculating about Bloomberg's views, he admitted that "[w]e haven't had the conversations with

Bloomberg regarding that." *Id.* at 155.  Such testimony as to why Bloomberg's treatment of Unicorn changed after it received Socialfix's cease-and-desist letter would consist either of out-of-court statements by Bloomberg employees impermissibly offered for the truth of the matter asserted, or improper opinion testimony that the deponent is not competent to provide.  *See, e.g.*, *Shaoxing Bon Textiles Co. v. 4-U Performance Grp. LLC*, No. 16 Civ. 6805 (JSR), 2017 WL 6413993, at *5 n.4 (S.D.N.Y. Nov. 22, 2017) ("These assertions of someone else's state of mind have no probative value and are inadmissible.").

That said, some of Socialfix's hearsay objections overreach.  Much of the testimony to which it objects consists of Gelinas's and Bodik's firsthand accounts of how the relationship between Unicorn and Bloomberg had worsened.  *See, e.g.*, Gelinas Tr. at 133 ("Q. How is your relationship with Bloomberg now?  A. Tenuous, to say the least."); Bodik Tr. at 155 ("Now, any little things we work with them on, there is not a quick response.  They take forever to get back. It's more of a cold relationship, even though there still is some sort of relationship.  It's been affected tremendously.").  This testimony, based on the witness's personal knowledge, is distinct from hearsay accounts of statements by Bloomberg personnel, or improper statements of opinion about Bloomberg's reasons for distancing itself from the Unicorn project.  It is admissible.

*Bodik Declaration:*  Last, Socialfix objects to Unicorn's reliance on facts first articulated by Bodik in his declaration submitted in connection with summary judgment, and accompanying exhibits.  *See, e.g.*, Socialfix Resp. at 12–13.  Socialfix argues that the declaration contradicts Bodik's earlier deposition testimony that Unicorn and Bloomberg were still working together at that time.  Had circumstances changed since that testimony was given, Socialfix argues, Unicorn had an obligation to supplement the discovery record, so as to allow Bodik's deposition to be reopened, rather than filing a declaration at summary judgment.  *Id.*  It further argues that the

invoices from Bloomberg attached to Bodik's declaration, having never been produced during discovery, should not now be considered.  Socialfix thus asks the Court to disregard (1) Bodik's account of post-discovery events; and (2) the invoices attached to his declaration purporting to evidence payments by Unicorn to Bloomberg.

As to the invoices, the Court holds with Socialfix.  During discovery, Socialfix requested from Unicorn "all documents which concern, refer, or relate to any pecuniary loss or loss of income or benefits for which Unicorn is seeking damages in this matter."  Weiner Decl., Ex. V ("Unicorn RFP Resp.") ¶ 36.  Unicorn responded:  "Unicorn objects to this request as irrelevant." *Id.*  Now, at summary judgment, Unicorn has come forward with nearly a dozen invoices from Bloomberg to Unicorn purporting to show the amounts that Unicorn paid to Bloomberg pursuant to the sponsorship arrangement discussed above.  *See* Bodik Decl., Ex. 1.  Unicorn has not offered any explanation for why it did not produce those documents during discovery, or why they were considered "irrelevant" to Socialfix's request for documents related to damages.  *See* Unicorn Reply at 6–8.  The Court thus disregards these invoices.  *See Richmond v. Gen. Nutrition Ctrs. Inc.*, No. 08 Civ. 3577 (PAE), 2012 WL 762307, at *8 (S.D.N.Y. Mar. 9, 2012) (precluding use at trial of documents relating to damages not produced during discovery); *Douglas v. Victor Cap. Grp.*, No. 96 Civ. 6557 (SHS), 1997 WL 716912, at *2 (S.D.N.Y. Nov. 17, 1997) ("Accordingly, since the document was requested but not produced in discovery, plaintiff is precluded from using the return receipt card on the summary judgment motion or at trial."); *Texaco A/S, S.A. v. Comm. Ins. Co. of Newark, N.J.*, No. 90 Civ. 2722 (JFK), 1996 WL 603915, at *1 (S.D.N.Y. Oct. 21, 1996) ("Moreover, the Court emphatically declines to consider those documents Texaco now submits that it did not produce to Defendants during discovery.").

The analysis is different as to the post-discovery facts described in the Bodik Declaration. Unicorn is correct that nothing in that declaration *contradicts* Bodik's deposition testimony:  At his deposition, Bodik testified that, as of that time, Unicorn and Bloomberg were still working together.  *See, e.g.*, Bodik Tr. at 212 ("It's much more of a formal relationship now.").  In his declaration submitted at summary judgment, he states that, *since his deposition*, the parties had ended their relationship.  Bodik Decl. ¶ 21 ("No future work is planned between Bloomberg and Unicorn."); *id.* ¶ 25 ("Bloomberg has also decided not to air the show[.]").  The latter is therefore not excludable on the basis that it seeks to disavow prior deposition testimony; Bodik instead attests to events post-dating the deposition.  *See, e.g.*, *Torrico v. IBM Corp.*, 319 F. Supp. 2d 390, 394 n.2 (S.D.N.Y. 2004) (considering post-discovery declaration that "augments, without contradicting, [the declarant's] deposition testimony, addresses issues not explored thoroughly in [those] deposition[s], or finds support in other evidence in the record").  Because the cessation of business relations between Unicorn and Bloomberg occurred after the deposition, it could not have been "explored thoroughly" there.  *Id.*  And Socialfix has not identified authority for the proposition that a witness, at summary judgment, may not update his deposition testimony to describe post-deposition developments.  *See* Socialfix Resp. at 12–13.[18]

Accordingly, for purposes of the pending motions, the Court will consider the facts as stated the Bodik Declaration.  And because Socialfix has offered no countervailing evidence that

---

[18] The cases Socialfix cites are inapposite.  *See, e.g.*, *Haas v. Del. Hudson Ry.*, 282 F. App'x 84, 85–86 (2d Cir. 2008) (summary order) (affirming exclusion of affidavit by witness whom proponent party had not *identified* until summary judgment, in violation of Rule 26).

Bloomberg has in fact continued to work with Unicorn or aired *The Unicorn*, for the time being the Court considers those facts to be undisputed.[19]

ii.     Merits

A reasonable finder of fact, considering the cognizable evidence, could conclude that Socialfix's legal threats toward Bloomberg harmed Unicorn's relationship with Bloomberg. First, Gelinas and Bodik testified extensively about the change in Bloomberg's relationship with Unicorn occurring after Socialfix threatened to sue Bloomberg for its use of the UNICORN mark. *See, e.g.*, Gelinas Tr. at 133 (relationship with Bloomberg became "[t]enuous, to say the least"); *id.* at 136 (Bloomberg stopped returning calls and emails); *id.* ("It was damaging big time."); Bodik Tr. at 153 ("So what was a good relationship, immediately after the cease and desist . . . , it was a huge detriment to our relationship . . . ."); *id.* at 155 ("Now, any little things we work with them on, there is not a quick response.  They take forever to get back.  It's more of a cold relationship, even though there still is some sort of a relationship.  It's been affected tremendously.").  And the parties do not appear to dispute that, at the least, immediately after Socialfix threatened Bloomberg in its cease-and-desist letter, Bloomberg "removed all Unicorn branding from the Future of Crowdfunding Event," which Unicorn had paid $150,000 to sponsor.  Unicorn 56.1 ¶¶ 60–61; Socialfix Reply 56.1 ¶¶ 60–61.

To be sure, that Bloomberg no longer intends to produce *The Unicorn* and that "[n]o future work is planned between Bloomberg and Unicorn" are less clearly attributable to Socialfix's actions than these other harms.  Bodik Decl. ¶¶ 20–22.  Unicorn and Bloomberg continued to work together for months after the cease-and-desist letter, through sponsored events

---

[19] Given Unicorn's introduction of Bodik's declaration recounting post-deposition events, the Court would look favorably on a motion by Socialfix to reopen discovery for the limited purposes of deposing Bodik and obtaining document discovery solely as to these events.

39

and, apparently, in other diminished capacities. *See, e.g.*, Bodik Tr. at 155 (conceding, in July

2019, that Bloomberg and Unicorn were continuing to work together nine months after Socialfix

sent the cease-and-desist letter). And setting aside inadmissible evidence, there is little if any

direct evidence tying Bloomberg's ultimate failure to air *The Unicorn* to Socialfix's conduct in

October 2018 or thereafter. Even nine months later, in July 2019, it still seems to have been

possible that the show would have aired. *See* Bodik Tr. at 158 (noting that Unicorn intended to

present additional material about the show to Bloomberg). While circumstantial inferences

conceivably could permit this conclusion, the Court, for present purposes, does not rely on the

fact that *The Unicorn* was never produced or aired as a form of harm proximately caused by

Socialfix.

There is, however, sufficient evidence that Socialfix's aggressive tactics caused tangible

harm to the relationship between Unicorn and Bloomberg. At a minimum, the temporal

proximity between Socialfix's cease-and-desist letter and Bloomberg's decision days later to

remove all Unicorn branding from its Future of Crowdfunding event is strong circumstantial

evidence of causation. A reasonable finder could similarly infer that this letter foreseeably

contributed to the broader ensuing disintegration of the relationship between Unicorn and

Bloomberg. It is credible that, upon being threatened by one of two major business partners with

whom Bloomberg had been working to produce *The Unicorn*, Bloomberg would seek to distance

itself from that venture. And Socialfix all but demanded that result in its cease-and-desist letter.

*See* Bloomberg Ltr. at 2 ("Be advised that you are hereby demanded to cease and desist from any

further use, display, publication, and/or distribution of any of the marks, names and Assets as

described herein and in the attached Unicorn Asset pdf."). Unicorn's claim of harm is therefore

not fatally "vague and speculative," in contrast to cases in which courts have granted summary

judgment based on a lack of reliable proof of causation.  *See, e.g.*, *Oxyn Telecomms., Inc. v. Onse Telecom*, No. 01 Civ. 1012 (JSM), 2003 WL 22271224, at *6 (S.D.N.Y. Sept. 30, 2003) (granting summary judgment where defendant "neither contacted, nor directed any actions, towards" third parties and causation was therefore "vague and speculative").  Accordingly, the Court denies Socialfix's motion for summary judgment on Unicorn's claim for tortious interference.

### 3.    Deceptive Acts and Practices Under N.Y. Gen. Bus. L. § 349

Socialfix has moved for summary judgment on Unicorn's claim for deceptive acts and practices under N.Y. Gen. Bus. L. ("GBL") § 349.  It argues that GBL § 349 requires conduct that is "consumer-oriented," and which has "significant ramifications for the public at large," and that Unicorn has not adduced any such evidence.  *See* Socialfix Mem. at 15–16 (first quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995), and then quoting *Shred-It USA, Inc. v. Mobile Data Shred, Inc.*, 228 F. Supp. 2d 455, 465 (S.D.N.Y. 2002)); *see also Perfect Pearl Co. v. Majestic Pearl & Stone, Inc.*, 887 F. Supp. 2d 519, 543 (S.D.N.Y. 2012) ("The prevailing view in the Second Circuit is that trademark infringement claims are not cognizable under [GBL § 349] unless there is a specific and substantial injury to the public interest over and above the ordinary trademark infringement." (citation omitted)).

Unicorn has not addressed this claim, even in passing, despite Socialfix's observation in its response that failure to do so likely constitutes abandonment of the claim.  *See* Socialfix Resp. at 1 n.1.  *See generally* Unicorn Mem.; Unicorn Reply.  The Court agrees with Socialfix on that point:  Unicorn has abandoned its claim under GBL § 349.  The Court therefore grants Socialfix's motion on it.  *See Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014) ("[A] partial response arguing that summary judgment should be denied as to some claims while not

mentioning others may be deemed an abandonment of the unmentioned claims."); *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 392 (S.D.N.Y. 2013) ("A court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." (quoting *Martinez v. City of New York*, No. 11 Civ. 7461 (JMF), 2012 WL 6062551, at*1 (S.D.N.Y. Dec. 6, 2012))).  In any event, on the record presented, no evidence has been adduced that Socialfix engaged in deceptive conduct oriented toward consumers or "the public at large."  Dismissal of this claim is also required on the merits.

### B.    Socialfix's Counterclaims for Unjust Enrichment and Quantum Meruit

Socialfix originally brought four counterclaims: (1) breach of contract; (2) quantum meruit; (3) unjust enrichment; and (4) promissory estoppel.  It has since dropped the first claim, for breach of contract.  *See* Socialfix Mem. at 3 n.1 ("Defendants hereby dismiss Count One of their Amended Counterclaim for breach of contract.").  And the instant motions do not address the fourth claim, for promissory estoppel.  Only  the second and third, for unjust enrichment and quantum meruit, are at issue.

To prevail on an unjust enrichment claim under New York law, a plaintiff must establish: (1) "that the defendant benefited; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 509 (2d Cir. 2009) (quoting *In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 129 (2d Cir. 2002)).  "[T]o recover in quantum meruit, New York law requires a claimant to establish (1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Id.* (quoting *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2000) (Sotomayor, J.)).

Although unjust enrichment and quantum meruit have nominally different elements, courts in this Circuit analyze them as a single quasi-contract claim for restitution. *See Leibowitz*, 584 F.3d at 509 n.9; *Mid-Hudson*, 418 F.3d at 175; *Newman & Schwartz v. Asplundh Tree Expert, Co.*, 102 F.3d 660, 663 (2d Cir.1996).

Socialfix has moved for partial summary judgment, solely as to liability, on this counterclaim.[20]  Unicorn opposes the motion.  It concedes that Socialfix performed services that Unicorn accepted, and that the parties expected Socialfix would be compensated for providing those services.  But it argues that there are genuine disputes about the specific services Socialfix provided to Unicorn, the nature and amount of compensation Socialfix expected, and whether the affirmative equitable defense of unclean hands bars Socialfix's recovery.  While recognizing that Socialfix appears to have a right to recover some amounts on its claims for unjust enrichment and quantum meruit, for the following reasons, the Court denies Socialfix's motion.

Significant facts on which these quasi-contract claims are based are not in dispute.  The parties agree that Socialfix provided Unicorn with a substantial number of services during the parties' year-long business relationship.  *See* Socialfix 56.1 ¶ 26; Unicorn Reply 56.1 ¶ 26.  Both agree that each expected Unicorn, in exchange, to compensate Socialfix.  Socialfix 56.1 ¶ 29; Unicorn Reply 56.1 ¶ 29.  Both agree that Socialfix has not received such compensation. Unicorn 56.1 ¶ 10; Socialfix Reply 56.1 ¶ 10; Unicorn Reply 56.1 ¶ 37 (admitting that no cash had been paid but maintaining that Socialfix's compensation was to take the form of equity in Unicorn); *id.* ¶ 31 (Unicorn never provided Socialfix with any equity, either).

---

[20] Both parties agree there are genuine disputes over the reasonable value of the services that Socialfix provided, precluding determination of damages on summary judgment.

To be sure, Unicorn cites substantial evidence that both parties expected Socialfix to have been compensated solely with shares of equity in Unicorn.[21]  But regardless of the form that compensation would have taken, it is undisputed that Socialfix expected to be compensated for its services.  And under New York law, a plaintiff seeking to recover in quantum meruit need only show that it had "an expectation of compensation" for the benefits it provided to another party, *Mid-Hudson*, 418 F.3d at 175, or that a defendant benefitted at plaintiff's expense, *see Leibowitz*, 584 F.3d at 509.  Here, the evidence reflects that the parties mutually understood that Socialfix was providing valuable services, and Unicorn intended to compensate Socialfix in proportion to the value of the services it provided.  *See, e.g.*, Weiner Decl., Ex. L (Gelinas explaining to Tateossian and Krysinski in March 2018 what would be needed "from a services point of view" to justify the "$1M (4% equity position)" that they contemplated).

Unicorn does not cite any authority that such recovery is limited to the specific form of payment the parties had in mind when the services, for which the plaintiff went uncompensated, were rendered.  *See* Unicorn Mem. at 9–12; *cf. Tasini v. AOL, Inc.*, 851 F. Supp. 2d 734, 741 (S.D.N.Y.) (discussing successful cases in which plaintiffs "expected compensation but the exact terms of the compensation were unclear"), *aff'd*, 505 F. App'x 45 (2d Cir. 2012) (summary order); *Atencio v. TuneCore, Inc.*, No. 16 Civ. 1925 (DMG), 2018 WL 6164787, at *12 (C.D. Cal. Sept. 21, 2018) (applying California law to hold that, where "the existence of a contract governing compensation is undisputed," plaintiffs may not recover in quantum meruit in excess

---

[21] *See, e.g.*, Unicorn Mem. at 9–12; *see also* Tateossian Tr. at 108 (Q. "So, as of October 9th, [2018,] you believe that you had an agreement with Unicorn for 1.25 million shares of stock? A. Correct.  Q. Okay.  Did you expect on top of that to also receive $75,000 a month for your work?  A. No, I did not.  Q. Okay.  So the stock was in lieu of that?  A. Yes."); Bodik Tr. at 59 ("A. There was going to be compensation. . . .  How I understood it, it was primarily equity and some payments.").

of the value of the stock options provided for in that contract).  Nor does Unicorn seriously

contend that, absent the application of an affirmative defense, Socialfix deserves *nothing*.  *See*

Unicorn Mem. at 12.  Accordingly, there is no genuine dispute that the parties expected Socialfix

to be compensated for the value of its services, and that no such payment was made.

The Court also does not find a genuine dispute as to whether the doctrine of unclean

hands precludes Socialfix's recovery.  It does not.  Unclean hands is an equitable, affirmative

defense on which Unicorn bears the burden of proof.  *See MBIA Ins. Corp. v. Patriarch Partners*

*VIII, LLC*, 842 F. Supp. 2d 682, 712 (S.D.N.Y. 2012).  As Socialfix notes, "[f]ailure to plead an

affirmative defense in the answer results in the waiver of that defense and its exclusion from the

case."  *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry.*, 762 F.3d 165, 176 (2d Cir. 2014) (quoting

*Satchell v. Dilworth*, 745 F.2d 781, 784 (2d Cir. 1984)); *see H&R Block Enters., Inc. v. Short*,

No. 06 Civ. 608 (JNE), 2006 WL 3437491, at *6 (D. Minn. Nov. 29, 2006) (barring unclean-

hands defense when defendant failed to raise in answer); 5 Charles Allen Wright & Arthur R.

Miller, Federal Practice and Procedure § 1278 (3d ed. 2011) ("It is a frequently stated

proposition of virtually universal acceptance by the federal courts that a failure to plead an

affirmative defense as required by Federal Rule 8(c) results in the waiver of that defense and its

exclusion from the case . . . .").  Unicorn first raised this defense in its opposition to Socialfix's

summary judgment motion.  It failed to do so in its answer to Socialfix's counterclaims.  Dkt. 44

at 11–13.  Although courts at times may entertain unpled affirmative defenses at summary

judgment, the Court does not perceive any reason to do so here, and Unicorn has not offered any.

*See Sompo Japan*, 762 F.3d at 176.[22]  This defense is therefore waived.

---

[22] Socialfix also contends that the defense is unavailable to Unicorn because, although often
styled an "equitable" claim, New York courts treat actions for quantum meruit or unjust

In any event, even if Unicorn had timely pled this defense, the facts adduced would not support it.  Under New York law, the doctrine of unclean hands is "never used unless the plaintiff is guilty of immoral, unconscionable conduct and even then only when the conduct relied on is directly related to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct.'"  *MBIA Ins.*, 842 F. Supp. 2d at 712 (quoting *Nat'l Distillers & Chem. Corp. v. Seyopp Corp.*, 17 N.Y.2d 12, 15–16 (1966)); *see TufAmerica, Inc. v. Codigo Music LLC*, 162 F. Supp. 3d 295, 328 (S.D.N.Y. 2016) (same).  Courts generally apply the doctrine only where they have found plaintiffs "guilty of truly unconscionable and brazen behavior."  *Gidatex S.r.L. v. Campaniello Imps., Ltd.*, 82 F. Supp. 2d 126, 131 (S.D.N.Y. 1999) (citing repeated misrepresentations to the court and fabricated testimony as examples of such behavior); *see Tyco Int'l, Ltd. v. Kozlowski*, 756 F. Supp. 2d 553, 556, 565 (S.D.N.Y. 2010) (unclean hands barred equitable claims for compensation brought by former employee who had pilfered "tens of millions of dollars" from employer's treasury); *Villacorta*, 2011 WL 2535058, at *1, 13–14 (unclean hands barred equitable claims for compensation by employee who misappropriated $50,000 of company funds, leading to indictment on 316 felony counts).  Socialfix's conduct here does not approach that level.  Unicorn terms Socialfix's attempt to register the UNICORN mark with the USPTO and its cease-and-desist letter "unconscionable

---

enrichment as actions at law, to which the equitable defense of unclean hands does not apply. *See* Socialfix Resp. at 7–8; *Dayton Superior Corp. v. Marjam Supply Co.*, No. 07 Civ. 5215 (DRH), 2011 WL 710450, at *19 (E.D.N.Y. Feb. 22, 2011); *Aniero Concrete Co. v. N.Y.C. Constr. Auth.*, No. 94 Civ. 3506 (CSH), 2000 WL 863208, at *10 (S.D.N.Y. June 27, 2000) (collecting cases); *cf. Rocks & Jeans, Inc. v. Lakeview Auto Sales & Serv., Inc.*, 184 A.D.2d 502, 503 (2d Dep't 1992) ("A cause of action for money had and received is an action at law and, therefore, the equitable doctrine of '[un]clean hands' does not strictly apply").  Many New York cases, however, have applied the defense to such claims. *See, e.g.*, *Melius v. Breslin*, 46 A.D.3d 524, 527 (2d Dep't 2007); *Villacorta v. Saks Inc.*, Index No. 100168/2007, 2011 WL 2535058, at *13–14 (N.Y. Sup. Ct. 2011).  Given the division of authority, the Court does not hold Unicorn's unclean-hands defense precluded on this alternative ground.

and brazen behavior." Unicorn Mem. at 13–14. But measured against the case law giving content to that standard, it does not fit here, or come close to doing so. *See, e.g.*, *Tyco*, 756 F. Supp. 2d at 556; *Villacorta*, 2011 WL 2535058, at *1, 13–14.

Socialfix has thus established that (1) it provided services to Unicorn; (2) Unicorn accepted those services; (3) the parties mutually understood that Unicorn would pay Socialfix for those services; and (4) the doctrine of unclean hands does not bar recovery. Nonetheless, for a limited reason, the Court declines to grant Socialfix summary judgment as to liability. That is because, on the facts here, the last element of its claim—the reasonable value of the services provided—requires, as a predicate, a finding as to the nature and scale of the specific services that Socialfix provided to Unicorn. *Topo v. Dhir*, No. 01 Civ. 10881 (PKC), 2004 WL 527051, at *4 (S.D.N.Y. Mar. 16, 2004). The summary judgment record does not establish those points with sufficient specificity. The parties appear to agree, at a high level of generality, on the services Socialfix provided. *See* Socialfix 56.1 ¶ 26; Unicorn Reply 56.1 ¶ 26. But before valuation can be assessed, a finding must be made "as to the services rendered" at a substantially more granular level than the summary judgment record permits. *Topo*, 2004 WL 527051, at *4. For example, the parties do not agree on the amount of time Socialfix spent working on projects for *The Unicorn*, *see* Socialfix Resp. at 2, 5 n.3, or the reliability of the belated invoices Socialfix submitted to Unicorn along with its October 2018 demand letter, *see* Socialfix 56.1 ¶¶ 27–28; Unicorn Reply 56.1 ¶¶ 27–28. Entry of summary judgment as to liability for Socialfix on these claims could capture only the general—and undisputed—proposition that it provided services that went uncompensated. But such an entry would leave unacceptably indeterminate the specific work for which Socialfix merited compensation.

The ultimate determination of the value of the services Socialfix provided to Unicorn—the damages inquiry—inevitably will depend on the resolution first of the parties' factual disputes over the amount and nature of Socialfix's uncompensated services.  *Topo*, 2004 WL 527051, at *4.  The Court will leave that determination for trial, at which the nature and the scale of the uncompensated services, and the intertwined question of the valuation of those services, will be resolved.  Accordingly, the Court denies summary judgment on Socialfix's claims for unjust enrichment and quantum meruit.

## CONCLUSION

For the foregoing reasons, the Court denies Unicorn's motion for summary judgment in full and grants Socialfix's motion for summary judgment solely as to Unicorn's GBL § 349 claim.  An order will issue shortly as to next steps in this case.

The Clerk of Court is respectfully directed to terminate the motions pending at dockets 75 and 80.

SO ORDERED.

PAUL A. ENGELMAYER
United States District Judge

Dated:  December 17, 2020
        New York, New York